**Albert J. HOBAN, Regional Director of the First Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED AIRCRAFT CORPORATION (PRATT & WHITNEY DIVISION AND HAMILTON STANDARD DIVISION), Respondent.**

Civ. No. 11466.

United States District Court
D. Connecticut.

Aug. 5, 1966.

Harold M. Kowal, Thomas M. Harvey, Boston, Mass., for Regional Director.

Mozart G. Ratner, Plato E. Papps, Washington, D. C., William S. Zeman, Hartford, Conn., amicus curiae for International Assn. of Machinists.

Joseph C. Wells, Reilly & Wells, Washington, D. C., Frank E. Callahan, Wiggin & Dana, New Haven, Conn., for respondent.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

The petition for injunctive relief was filed by the Director of the First Region of the National Labor Relations Board. This Court has jurisdiction of the litigation pursuant to 10(j) of the National

Labor Relations Act as amended, (61 Stat. 149; 73 Stat. 544; 29 U.S.C. § 160 (j)). The National Labor Relations Board seeks a temporary injunction against the United Aircraft Corporation (Pratt & Whitney Division and Hamilton Standard Division) to preserve the status quo, between it and the complaining Union Lodges #1746 and #743 of the International Association of Machinists and Aerospace Workers, AFL–CIO. Relief is sought pending final disposition by the Board of certain unfair labor practice charges filed by the General Counsel against the respondent-employer. It alleges that the latter has engaged in, and is engaging in certain acts and conduct in violation of § 8(a), (1), (3), (4) and (5) of the Act (29 U.S.C. § 158(a) (1), (3), (4) and (5)).

The Board requests that the Court issue a restraining order, enjoining the respondent from refusing to recognize Lodges #1746 and #743 as the exclusive collective bargaining representative of its employees and refusing in good faith to bargain collectively with them; that the terms of employment be restored and remain the same as those which existed prior to respondent's withdrawal of recognition under the then existing labor contracts; and to refrain from interfering with or coercing employees in the exercise of their rights under the Act.

The Court will summarily review the immediate background of the labor relationship of the complaining unions with the respondent-employer. After an election 21 years ago, Lodge #1746 was certified by the National Labor Relations Board as the exclusive representative of all employees for the purposes of collective bargaining in the respondent's East Hartford plant. In May 1957, the Board certified said union as the exclusive bargaining agent for the employees in the respondent's Manchester plant.

On July 3, 1941, Lodge #743 was certified by said Board as the collective bargaining representative of all production and maintenance employees of the Hamilton-Standard Division in Windsor Locks, Connecticut. On October 14, 1941, it was certified as the representative of the employees at the plant in Broad Brook, Connecticut.

Subsequent labor contracts between the parties were entered into; the last regular contract executed by #1746 with said respondent-company was dated December 1, 1962, which would have expired by its original terms on December 1, 1965. The last regular contract executed by #743 was dated February 18, 1963, which would have expired by its original terms on April 21, 1966.

Prior to the expiration of said contract with #1746, the union gave written notice[1] to the company in accordance with the law[2] and the provisions of said contract,[3] that it would not renew the same and desired to negotiate a new contract. Pursuant thereto, negotiation sessions were held between the representatives of #1746 and #743 and representatives of the company on various dates, on which they discussed and bargained on several proposed modifications of the existing contracts.

After the meeting on the first day of October, it was agreed that representatives of the company would meet with Mr. Ralph Oehler who had been designated by Mr. Roy Siemiller,[4] the International President of the Association of Machinists, to negotiate the new contract. During the course of these negotiations, Mr. Oehler represented to the company bargaining representatives that he was authorized to not only negotiate a new labor contract, but also to discuss, compromise, and settle the pending litigation between the unions and the company which had been pending before the National Labor Relations Board since September, 1963, arising out of a strike in the summer of 1960.[5] With that understanding, several meetings were held be-

1. Government's Exhibit 5.

2. 29 U.S.C. § 158(d).

3. Government's Exhibt 39, p. 39.

4. Tr. 501, 625.

5. Case #1–CA–3355.

tween the parties wherein the unions were represented by Mr. Oehler and Mr. Thurer, also an International representative, as well as with other officers of the International Union; at one of these held at the union's International Headquarters, in Washington, D. C., Mr. Brunner, Vice-President, and Mr. Siemiller participated.[6] During the course of these negotiations, the parties explored the possibility of settling all of the litigations, including the charges pending before the National Labor Relations Board, and the damage suits in the United States District Court of Connecticut, and the counter-suit of the company against the unions pending in the Superior Court of the State of Connecticut.[7] Extensive discussions were had at these several meetings and tentative agreements worked out on practically all issues in the proposed labor contracts, except the question of union security. The unions had requested a complete union shop; thereafter they modified their demand on union security to maintenance of membership. This proposal meant that employees hired by the company who joined the union would maintain their membership during the duration of the agreement.[8]

The company, on the other hand, took the position that it would not sign a contract which would compel anyone to join a union if they did not choose to do so, as a condition of employment.[9] However, they would agree not to do anything to interfere with or discourage the normal growth of union membership among its plant employees.

Finally, on March 2, 1966, a meeting was held between the parties which was attended by representatives of the company and Mr. Oehler and Mr. Thurer, and at that time, the issue of union security

being contained in the employment contract became the stumbling block to an agreement.[10] Permeating all of these discussions, however, was the underlying issue of dropping the pending complaints before the National Labor Relations Board and the court litigations. On March 2, 1966, negotiations collapsed between the parties. At that time, the final proposals of the respective parties had not been formally presented to both negotiating parties at the bargain table.

The very next day, March 3, 1966, the president of Lodge #1746 sent a telegram to the respondent-company notifying it of the union's willingness to renew the existing contract for a period of three years, subject to any orders subsequently issued by the National Labor Relations Board or the courts in the pending litigations.[11] This telegram was confirmed the following day in writing.[12]

While employment contracts were still existent between the parties, the company notified the unions of its willingness to meet with the bargaining committees of Lodges #1746 and [#743] on March 10, 1966.[13] At that meeting, the company notified the union bargaining representatives, by tendering a written letter to them,[14] that it questioned whether either of said unions represented a majority of the employees in their respective plants, and requested that they seek an election through the National Labor Relations Board to resolve the issue. It further advised the union representatives that if they failed to do so, or refused to, the company itself would apply for such an election.[15] The company's action was taken without acting or commenting on the unions' counterproposal of March 3, 1966. The company terminated the temporary contract with #1746 as of March 18, 1966,[16] and

6. Respondent's Exhibit C.

7. Tr. 398.

8. Tr. 512.

9. Respondent's Exhibit C; Tr. 400.

10. Tr. 644.

11. Government's Exhibit 7.

12. Government's Exhibit 8.

13. Government's Exhibit 9.

14. Government's Exhibit 11.

15. Government's Exhibit 51.

16. Government's Exhibit 12.

said notice to #743 terminated its contract on its expiration date, April 21, 1966.[17]

The National Labor Relations Board claims that the company is guilty of an unfair labor practice in that it has refused to bargain collectively with #1746 and #743 as the exclusive certified bargaining agent of the respective employees whom they represent. Its position is that the company cannot ask for an election while there are unfair labor practice charges pending before the Board. It claims that it is reasonable for the Board to believe that the unfair labor practices charged, may be the cause of the present minority status of the unions and until this question is resolved, it would be grossly unfair to order an election. All parties presently concede that the present actual membership in each of said unions is clearly a minority of the total employees represented, and that their present claimed majority status is one of law and not of facts.

There has been pending before the National Labor Relations Board since September, 1963, charges of unfair labor practices which are in the process of being heard. In these, the unions charge that the company has been guilty of unfair labor practices both prior to, and subsequent to the strike in 1960 and that said conduct on the part of the company has undermined and made it impossible for them to effectively represent the employees. During the course of the negotiations for the new contract which commenced October 1, 1965, the unions filed an unfair labor practice charge on November 26, 1965, alleging that the company was not bargaining in good faith.[18] At the termination of the negotiations on March 11, 1966, the unions again filed an unfair labor practice charge, on March 17, 1966, alleging that the company had not been bargaining in good faith.[19]

■ It is only upon these two latter complaints, that the petitioner seeks this injunctive remedy; however, it does claim as relevant, the pending charges filed September, 1963, although it has offered no evidence concerning them.[20] At the time of the unfair bargaining charge filed on November 26, 1965, Mr. Ralph Oehler was the chief bargaining negotiator of the unions. He admitted that the charge was filed by the unions' general counsel, Mr. Papps, without his having any prior knowledge of it.[21] He expressed the opinion that at all times, to the best of his knowledge, during the period that he negotiated with the company from October 1, 1965, through March 2, 1966, the representatives of the company were at all times bargaining in good faith.[22] This Court finds, upon the evidence educed at the hearing, that the National Labor Relations Board could not reasonably believe or find that there was any merit to the allegations of the complaint filed October 29, 1965, and it cannot therefore be considered by this Court as a basis for an unfair labor practice charge against the company.

■ The pendency of the second complaint filed March 11, amended May 31, 1966, #1–CA–5372, alleges unfair labor practice on the part of the company in its dealings with Lodges #1746 and #743. One of the bases for the claim is that the International union representative, Mr. Oehler, advised the company to take a firm or hard position with the union negotiating committee, so that he (Mr. Oehler) might then exercise a stronger and more persuasive influence in getting the committee to accept a reasonable contract, on terms which he and the company would agree. The company admittedly did take a hard position at the formal bargaining negotiations at the table with union representatives. Mr. Oehler stated, however, that he and Mr. Thurer had completely appraised the union bargaining committees with the

17. Government's Exhibit 14.

18. Case #1–CA–5245.

19. Case #1–CA–5372.

20. Tr. 380–388.

21. Tr. 594.

22. Tr. 673, 676.

material issues discussed at all times, except that they did not acquaint them with the details of the conversations. The bargaining committees of both unions knew that Mr. Oehler was representing them in these negotiations and they acquiesced and approved of his authority in so doing. It is common practice in the field of labor negotiations, for an experienced, expert representative of the international union, to deal with company representatives in behalf of a union bargaining committee, out of their presence. This practice has made it a not uncommon practice for management to express a hard position in the presence of the local bargaining committee and then take a more compromising active position with the authorized bargaining representative.[23] While the moral ethics of this practice may be debatable, this Court finds that it is not reasonably probable, under the circumstances herein disclosed, that the National Labor Relations Board would find that the company had committed an unfair labor practice with an authorized union representative in this bargaining procedure.

However, there is one other phase of the bargaining negotiations wherein it is reasonably probable that the National Labor Relations Board could conclude that the company had been guilty of unfair labor bargaining or conduct; and that is the company's refusal to consider the counter-offer made on March 3, 1966, by the union, to continue the existing contracts under their already existing terms.

The company's position is that it cannot lawfully be required to bargain with a minority union; that notwithstanding the fact that unfair labor practices are pending before the National Labor Relations Board, which might ultimately be found by the Board to be a cause of the minority status of said union, it has the right as well as the duty to challenge the union's minority status, before entering into new contracts. Their position is that if the National Labor Relations

Board should ultimately find that the company had been guilty of unfair labor practices and that such conduct had been the cause of the unions' minority status, the company's failure to negotiate with the unions could then, and only then, be considered an unfair labor practice.

The respondent relies upon two decisions of the National Labor Relations Board, Stoner Rubber Co., 123 N.L.R.B. 1440 (1959) and Celanese Corp. of America, 95 N.L.R.B. 664 (1951), to support its position. Those cases held that it is not an unfair labor practice for an employer to refuse to bargain with a union, that it reasonably believes no longer represents a majority of employees, after a year has elapsed since certification. If following this withdrawal of recognition the employer takes unilateral action with respect to working conditions, he does so at the peril of the Board's findings that a majority does exist. In either case, the loss of majority must not be due to employer unfair labor practices.

The *Stoner* and *Celanese* decisions have been approved in the Fifth and Sixth Circuits. NLRB v. Minute Maid Corp., 283 F.2d 705, 95 A.L.R.2d 660 (5th Cir. 1960); Carey Mfg. Co., Miami Cabinet Division v. NLRB, 331 F.2d 720 (6th Cir. 1964). The Supreme Court has also implicitly approved *Celanese*. Brooks v. NLRB, 348 U.S. 96, 104 n. 18, 75 S.Ct. 176, 99 L.Ed. 125 (1954). This Circuit has also approved of the principles enunciated in *Stoner, Celanese* and NLRB v. Minute Maid Corp., supra; NLRB v. Superior Fireproof Door & Sash Co., 289 F.2d 713 (2d Cir. 1961). See also NLRB v. Warrensburg Board and Paper Corp., 340 F.2d 920, 923 (2d Cir. 1965).

However, the facts in this case are distinguishable from those in *Stoner* and *Celanese*. It is significant to note, that at least since the strike in the summer of 1960, both parties concede that neither of said unions have had an actual majority status. Notwithstanding this condition, the company knowingly with-

23. Tr. 486, 487.

drew its application for an election in 1960 and entered into new contracts with the unions.[24] Upon the original termination of the existing contract November 30, 1965, while negotiations were pending for the formulation of a new contract, representatives of Lodge #1746 and the company agreed upon an amendment to the existing labor contract which incorporated therein a new economic package, so-called, consisting of wage increases and fringe benefits.[25] This contract was thereafter extended until January 7 by mutual agreement of the parties and contained a further extension provision of successive two-week periods, which could be terminated at the end of each such subsequent period, upon three days' notice.[26] All during this period, the company knew that both unions maintained an actual minority status.[27] Notwithstanding its awareness of this circumstance, the company continued to negotiate new contracts through these minority unions and at the same time encourage industrial peace through the elimination of the unfair labor charges pending before the National Labor Relations Board, together with the mutual damage claims in the courts.

■ The company was willing to participate in these negotiations, so long as it might anticipate results which would satisfy its objectives. The settlement of the charges pending before the National Labor Relations Board and the courts were inextricably bound up in the negotiations with the terms of the current labor contract being negotiated.[28] There was nothing improper in this procedure, provided these items did not become a condition precedent for continuing the contract negotiations. In fact, the inclusion of the court cases and the labor board complaints in these settlement discussions, was openly done with the full knowledge and approval of the General Counsel for the National Labor Relations Board.[29]

■ However, outside elements or conditions cannot be permitted to become a condition of negotiation. In view of the company's long willingness to knowingly accept and negotiate with a minority status union, so long as it served its purpose, and then to withdraw recognition prior to the expiration of the extended contract and while the union's counter-offer was pending, is indicative of the fact that the company considered the settlement of the pending labor board charges and the pending court actions to be not only a vital condition, but a *sine qua non,* without which it was unwilling to continue the bargaining relationship.

■ The insurmountable obstacle of union security, which appeared to constitute an impasse on March 2, 1966, was washed away the following day, on March 3, 1966, when the union #1746 submitted its counter-proposals to continue the existing contract without union security for a three-year period.[30] It is significant to note that the extension agreement executed December 6, 1965, indicated an intention on the part of both parties, to enter into a new employment agreement, which would extend to November 30, 1968. This new contract was to reflect the agreement already reached on the major issues, namely: wages, vacation, holidays, paid sick leave and funeral leave, group insurance and retirement. From all of the circumstances, the National Labor Relations Board could reasonably find that there was probable cause to believe, that the company was actually including the settlement of the labor board and court cases as a condition precedent without which the company would not continue to bargain with the unions. For the company to raise the issue of union minority status at that particular stage of the negotiations dis-

---

24. Government's Exhibits 39, 39A, 40, 40A.

25. Government's Exhibit 3.

26. Government's Exhibit 4.

27. Tr. 105–107.

28. Tr. 462–3, 593.

29. Tr. 415, 416.

30. Government's Exhibits 7, 8.

closed its true intention. Such conduct could constitute an unfair labor practice of not bargaining in good faith. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed. 2d 823 (1958).

■■ This Court is very reluctant to order any company to bargain with a union which admittedly has current actual minority status. See Brooks v. NLRB, supra. However, considering the pendency of the unfair labor practice charges before the Board which remain unresolved; the fact that the company since 1960 has continuously bargained with said unions, with full knowledge of their minority status; and finding further that the Board could reasonably believe that the company was guilty of an unfair labor practice in making the withdrawal of the pending charges before the labor board and the damage suit in court, a condition precedent, without which it would bargain no further; and in view of the fact that the counter-offer of the union never was formally rejected, except by the abrupt and arbitrary notice of withdrawal of recognition, the Court is of the opinion that equity demands intervention to restore the bargaining status of the union.

■ The contract expired through a procedure created by the contracting parties. It is not for this Court to reinstate an agreement, which by the exercise of its terms, had come to an end. There could be no illegality in doing that, which the parties agreed could be done. The privilege enjoyed by the union existed only by virtue of the contract. In the absence of the contract, they are not entitled to check-off or other rights therein provided. Industrial Union of Marine & Shipbuilding Workers of America, etc. v. NLRB, 320 F.2d 615, 619 (3d Cir. 1963).

The Court is not unmindful, that in both agreements, the contract with #1746 and the contract with #743, termination was originally instituted by the union. Neither of said contracts contain any provision that their terms shall remain in effect until a new one is negotiated. For this Court so to rule, would require it "to read into the agreement a provision which is wholly absent —a provision that the agreement should remain in effect until superseded by a subsequent agreement—thus affording a greater security for the Union than it obtained at the bargaining table." Communications Workers of America, CIO v. NLRB, 215 F.2d 835, 839 (2d Cir. 1954). It is not, therefore, incumbent upon this Court to reinstate such an employment contract.

■ The Court does find that the legal and exclusive collective bargaining representatives of the employees covered by the contract with the company and Lodge #1746, prior to the contract expiration date of March 18, 1966, is Lodge #1746 of the International Association of Machinist and Aerospace Workers, CIO–AFL; and similarly, that the employees covered in the contract of Lodge #743 which expired April 21, 1966, are presently legally and exclusively represented for purposes of collective bargaining by Lodge #743 of the International Association of Machinists and Aerospace Workers, CIO–AFL. Resumption of collective bargaining with the unions by the respondent, pursuant to this decision or its agreement to a new employment contract, will not constitute a waiver of any rights which respondent may have to assert, in respect to a claimed lack of union majority status.

The Court concurs with the observation made by the United States Court of Appeals for the District of Columbia, in United Aircraft Corporation v. McCulloch, 365 F.2d 960, decided July 21, 1966, where it states, "while the delay in decision does seem lengthy, we are not able to say that the cause of the delay was entirely one sided." The prolongation of this labor dispute can only be shortened by the National Labor Relations Board's exercising its full statutory and procedural power in making a prompt finding, as to the unions' status at the respondent's plants.