440 F.2d 85
 76 L.R.R.M. (BNA) 2761, 65 Lab.Cas. P 11,576
 UNITED AIRCRAFT CORPORATION, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent (two cases).
LOCAL LODGE 1746, Canel Lodge No. 700, Local Lodge 1746-A,
and Local Lodge 743, International Association of
Machinists & Aerospace Workers, AFLCIO,
Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent (two cases).
 Nos. 88-92, 182, Dockets 34342, 34381, 34399, 34483, 34515
and 34379.
 United States Court of Appeals, Second Circuit.
 Argued Oct. 14, 1970.
Decided March 9, 1971.
 
 Joseph C. Wells, Washington, D.C., for United Aircraft Corp., petitioner.
 Elliott Moore, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Stanley J. Brown, Atty., N.L.R.B., on the brief), for N.L.R.B. respondent.
 Mozart G. Ratner, Washington, D.C. (Plato E. Papps, and Stephen D. Gordon, Washington, D.C., on the brief), for Local Lodge 1746, and others, petitioners.
 Before CLARK, Associate Justice,* LUMBARD, Chief Judge, and KAUFMAN, Circuit Judge.
 LUMBARD, Chief Judge:
 
 
 1
 These are consolidated cases involving two separate proceedings before the National Labor Relations Board which culminated in unfair labor practice findings against United Aircraft Corporation. United Aircraft petitions to set aside the Board's findings that it violated section 8(a)(1) of the National Labor Relations Act by threatening and coercively interrogating employees because of their union activities, and that it violated sections 8(a)(3) and (1) by discharging employees because of their union activities or without cause while they were engaged in protected activity. The four unions, which represent production and maintenance employees at United Aircraft's several Connecticut plants,[1] petition to review the Board's failure to nullify the company's 'no solicitation' rule and its refusal to find a violation of section 8(a)(5) arising from the company's failure to honor employee requests for assistance of union stewards. The Board cross-petitions for enforcement of its orders entered on review of Trial Examiner Weil's decision, 179 N.L.R.B. No. 160, and on review of Trial Examiner Peterson's decision, 180 N.L.R.B. No. 49.
 
 
 2
 These cases were heard on the same day as United Aircraft Corp. v. N.L.R.B. (District 91, IAM), 2 Cir., 434 F.2d 1198, decided November 16, 1970, in which the same parties were involved. We there enforced an order of the N.L.R.B. directing United Aircraft to furnish the unions with the names and addresses of all bargaining unit employees. The background of the dispute between United Aircraft and the several locals of the International Association of Machinists, together with the prior court proceedings and contract negotiations, is fully set forth in the opinion in that case and need not be repeated.
 
 
 3
 We deny the petitions for review, and enforce the Board's orders in all respects.
 
 I.
 
 4
 Trial Examiner Weil found that United Aircraft had discriminated against five of seven stewards who were discharged or disciplined allegedly because of their union activities. He found further that certain interrogations conducted by company investigators, threats directed against union stewards, and one instance of confiscation of a dues authorization card all violated section 8(a) (1) of the Act. Examiner Weil also found that United Aircraft violated section 8(a)(5) by refusing to honor employee requests that they be allowed to consult stewards during interrogations or that stewards be allowed to assist them in filing grievances.
 
 
 5
 The Board sustained Examiner Weil's findings of coercive interrogation, threats, and unlawful seizure of a dues authorization card in violation of section 8(a)(1). The Board also agreed that the discharge of stewards Menard, Nelson, Gahagan and DeMerchant, and the suspension of steward Tardiff, were motivated by anti-union animus and hence unlawful under section 8(a)(3). The Board also found, contrary to Examiner Weil, that the discharges of stewards D'Andrea and Brandt were discriminatory as well, concluding that any violations of company rules of which they may have been guilty served merely as a pretext for their dismissal. However, on the basis of an intervening decision by the United States Court of Appeals for the District of Columbia Circuit in Lodges 1746 and 743, IAM v. N.L.R.B., 135 U.S.App.D.C. 53, 416 F.2d 809 (1969), cert. denied, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970), the Board declined to find a section 8(a)(5) violation because of United Aircraft's refusal to call stewards as requested by employees. The District of Columbia Circuit had denied enforcement to an N.L.R.B. order to bargain with the unions, finding that United Aircraft had a reasonably grounded good-faith doubt of their majority status in March 1966. The Board held that since, under this decision, Lodge 1746 did not enjoy a majority during the relevant period, United Aircraft's refusal to honor requests for stewards was not an unfair labor practice.
 
 
 6
 Pursuant to these findings, the Board ordered United Aircraft to cease and desist from coercively interrogating, threatening or intimidating employees in connection with their union membership, sympathies, or activities; discouraging membership in a labor organization by discharging or otherwise discriminating against employees because they engage in concerted activity; and 'in any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them in the Act.'
 
 
 7
 The Board further ordered that the six discharged stewards be reinstated with back pay, and that steward Tardiff, who was suspended for three days, be made whole for the wages thereby lost.
 
 
 8
 The hearing before Trial Examiner Peterson involved related complaints filed after the close of the hearing before Examiner Weil. Examiner Peterson upheld the General Counsel's contention that three more stewards, Wing, Ardenski, and Wiseman, were discriminatorily disciplined. But he declined to find that the company's no-solicitation rule and the contractual provision barring union solicitation during working hours were 'coercively and excessively enforced' or that interrogation of employees by United Aircraft's internal security investigators violated section 8(a)(1).
 
 
 9
 The Board adopted Examiner Peterson's findings. It ordered reinstatement with back pay to the three union stewards, and ordered that the company cease and desist from discriminatory suspensions or discharges or from otherwise discriminating in regard to any term or condition of employment. The Board also ordered United Aircraft to cease and desist from interfering with, restraining, or coercing its employees in the exercise of their section 7 rights.
 
 II.
 
 10
 We need only outline some of the facts which in our view manifestly support the Board's ultimate finding that whether or not some of the disciplined union stewards violated company rules, the action taken against all was motivated in whole or in part by these stewards' union activities.
 
 
 11
 1. Termination of Kenneth Menard.
 
 
 12
 On November 2, 1966, Kenneth Menard, a shop steward at the Middletown plant, was terminated ostensibly for soliciting union membership during working hours in violation of company rules and a contract provision.[2] The Board and Examiner Weil concluded, with substantial support in the record, that the discharge was the end product of an extensive fishing expedition and an investigative file built largely on untruths and distortions. Menard had been elected shop steward in September, 1966, and shortly thereafter approached several employees to get their name, address, and clock number-- information that should have been furnished by United Aircraft to the union, as we held in United Aircraft Corp. v. N.L.R.B., 434 F.2d 1198 (1970). Foreman Karlon, observing this activity, reported that Menard had solicited employee Guyette to join the union. At trial, Karlon as well as Guyette testified that the latter only said that Menard had asked for his name, clock number, and address.
 
 
 13
 When interviewed by two security investigators, Guyette stated that he noticed the name of Armand Morin in Menard's notebook. The investigators considered this good cause for questioning Morin, but Morin told them that Menard had only asked him for his name and address. With their investigation thus far fruitless, the investigators secured in writing foreman Karlon's hearsay statement which, as noted above, was false. A day or two later, Karlon informed the investigators that Menard had spoken with employee Boucher, and hence Boucher was questioned. Boucher said that Menard wanted his name and information needed by the union to send him his job card. Thus, Menard had not solicited him to join the union, but Boucher added that this was the fifth or sixth time that Menard had solicited him. Morin was reinterviewed, and 'confirmed' that Menard told Boucher the union could help him, although Boucher had not said this. Boucher also told of an earlier solicitation by Menard, but Menard was not a union steward at the time. Company investigators then interviewed two other employees, who denied being solicited during working hours.
 
 
 14
 Finally, Menard was interrogated for nearly four hours and asked repeatedly to confess soliciting on company time. Menard admitted that he tried to obtain names and addresses, mainly on his lunch break. The Board credited Menard's account that after his 'confession' was secured, the investigators told him that 'they had heard of people who had quit the union, the company had taken it into consideration and these people were still working at Pratt and Whitney.' Menard then asked foreman Karlon about this, and he replied that 'it might help out' if Menard left the union. Menard then wrote a letter of resignation from the union, but subsequently changed his mind, and was fired a week after the interrogation.
 
 
 15
 Trial Examiner Weil and the Board concluded on the basis of the foregoing that the purpose of Menard's discharge was to discourage union activities, even though it appeared that on a few occasions, Menard might have solicited during working time.
 
 
 16
 2. Termination of Clifford Nelson.
 
 
 17
 On May 10, 1967, union steward[3] Clifford Nelson was terminated at the East Hartford plant. The investigation of Nelson was triggered by a letter from employee Lancelot, who had just quit, saying: 'I feel I cannot get ahead because I did not join the Union, nor did I fit in the clique that is in our crew. I do not approve of favoritism.' Lancelot was then interviewed. He repeated his favoritism charge, and also claimed that Nelson had solicited him during working hours to join the union on several occasions. As the Board noted, the charge of favoritism, which was really directed against Lancelot's foreman, was ignored completely and the ensuing investigation's sole purpose was to build a record against Nelson.
 
 
 18
 At the outset, the investigators ran into to difficulty. Employee Kelley said he had been solicited during the lunch hour, after they had just washed up. Instead, the investigators drew up a statement reading that 'this happened while they were working.' When he objected, Kelley was told that this statement would be deleted, but it never was. Employees Hardie and Herring were interviewed because they were witnesses to Nelson's solicitations. Hardie said: 'I don't recall this as having taken place before lunch.' Herring said 'we were putting our tools away getting ready to leave for lunch.' The investigators reported that 'both Herring and Hardie substantiated the allegations made by Lancelot and Kelley,' although it seems clear that their statements raised a strong possibility that the incident occurred during lunch hour. The trial examiner concluded that 'the investigators created ambiguous statements and relied on the ambiguity' to avoid raising the issue of whether the company's no-solicitation rule applied to nelson's activities.
 
 
 19
 Several other employees were interrogated, but they disclaimed knowledge of Nelson's solicitations. Nelson himself was interrogated for two hours and denied Lancelot's charges; he subsequently quit when offered the alternative of being fired.
 
 
 20
 3. Suspension of Daniel Wing.
 
 
 21
 On September 5, 1968, union steward Daniel Wing was suspended for five days for conducting union business during working hours. Wing had previously received successive wage increases, and had been told by his foreman that he was the best grinder on the three shifts.
 
 
 22
 Wing's troubles began when foreman Bogdan found employee Pegorer at Wing's machine in the act of signing a union authorization card. Bogdan confiscated the card, and Pegorer was interrogated by internal security investigators. When asked the time Wing had given him the cards, Pegorer originally stated that 'during my lunch time * * * I got in touch with the union steward in my department.' The reference to lunch time is crossed out, and written above are the words 'the afternoon and on working time.' At the hearing, Pegorer explained that the investigators made this change because he wasn't sure of the time.
 
 
 23
 Wing's testimony, which was credited by Trial Examiner Peterson, was that he originally gave the cards to Pegorer during their lunch break. Pegorer came over the following day while Wing was at his machine, and asked whether the cards were properly filled out. Wing glanced over, saw that they were not signed, and told Pegorer so. As Wing shut off his machine to explain that the card should not be signed now, Bogdan confiscated the cards. Accordingly, the trial examiner found that Wing committed no infraction of company rules.
 
 
 24
 4. Termination of Nicholas D'Andrea.
 
 
 25
 On May 12, 1968, union steward D'Andrea was terminated at the company's Southington plant. Soon after he became steward, D'Andrea filed a grievance that foreman Mason was assigning overtime unfairly. As a result, a number of employees stopped receiving overtime. One of these employees, Bryda, reported to Mason that D'Andrea had harassed two other employees because they would not join the union. In reporting this to Internal Security, Mason added the then groundless allegation that D'Andrea solicited during working hours. Internal Security interrogated eight employees, seven of whom had lost overtime as a result of the grievance.
 
 
 26
 As Trial Examiner Weil and the Board found, D'Andrea was then subjected to two successive days of questioning. The investigators shouted at him, accused him of various misdeeds, and told him they would prove he was guilty. When D'Andrea had to relieve himself, one investigator followed him into the washroom because 'I thought you (D'Andrea) were running away.' When the investigators started to take a statement from D'Andrea, D'Andrea balked because the form began: 'I, Nicholas D'Andrea, of my own free will and without fear * * *' On each day, the interrogation ended with D'Andrea going to the medical office. D'Andrea claims that the nurse found him feverish on both occasions. The company produced no medical records. He went to the union hall the first afternoon and gave an affidavit recounting the interrogation which essentially paralled his testimony. On the second day, while D'Andrea was resting following his medical examination, he was discharged.
 
 
 27
 All those who gave statements against D'Andrea testified at trial. Trial Examiner Weil disbelieved all but two of the company's witnesses, because they gave evasive and contradictory answers, and also because they conspired against D'Andrea for his filing of the overtime grievance. Nevertheless, the trial examiner concluded that D'Andrea did solicit for the union during working time, and upheld his discharge. The Board reversed, finding that on the record as a whole, including the interrogation and other instances of the company's unlawful activities, D'Andrea was really discharged because he was an active union steward.
 
 III.
 
 28
 In the preceding section, we have outlined the background of only four of the nine discharges or suspensions. This is sufficient to demonstrate the company's use of altered and misleading affidavits, intemperate conduct of company investigators, interrogations designed to find some basis for discharging stewards, and discharges on the basis of evidence that was, in the Board's words, 'false, biased, minimal or distorted.' To be sure, General Counsel's evidence was disputed by United Aircraft, but Trial Examiners Weil and Peterson heard the witnesses and resolved the conflicts of credibility. Our perusal of the record shows that their factual findings are supported by substantial evidence.
 
 
 29
 The company does not seriously argue that we should overrule the Board's findings of fact that led it to conclude that the discharges violated sections 8(a)(1) and (3) of the National Labor Relations Act. Indeed, even if it could establish that the disciplined employees violated company rules-- and the Board concedes that in some cases a lawful cause for discharge did exist-- the Board's finding of discriminatory motivation cannot lightly be overturned. As we recently stated in upholding the Board's findings of discriminatory discharge:
 
 
 30
 'But respondent fails to acknowledge the restricted nature of this court's power to review the Board's determination of employer motivation, the gravamen of a section 8(a)(3) violation. Moreover, the existence of a lawful cause for discharge does not insulate an employer from a determination that it violated section 8(a)(3) if the Board makes a finding, supported by substantial evidence, that the discharge was at least partially because of union activities. N.L.R.B. v. Dorn's Transportation Co., 405 F.2d 706, 713 (2d Cir. 1969); J. P. Stevens & Co. v. N.L.R.B., 380 F.2d 292, 300 (2d Cir.), cert. denied, 389 U.S. 1005 (88 S.Ct. 564, 19 L.Ed.2d 600) (1967).'
 
 
 31
 N.L.R.B. v. Gladding Keystone Corp., 435 F.2d 129, 131 (2d Cir., 1970). See also N.L.R.B. v. Pembeck Oil Corp., 404 F.2d 105 (2d Cir., 1968), rev'd as to remedy sub nom. Atlas Engine Works, Inc. v. N.L.R.B., 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969).
 
 
 32
 United Aircraft's main argument centers on the fact that in each case, the Company acted upon investigative reports compiled by the internal security department, and that these reports contained material which would lead a reasonable man to conclude that the stewards had solicited union membership or transacted union business during working hours. We reject the suggestion that United Aircraft can evade responsibility in this manner. First, in many instances the investigative files themselves clearly showed that the statements obtained were sharply conflicting or the case for discharge otherwise doubtful. Surely the company cannot claim immunity for discharges in those instances, and its alleged good faith therefore is questionable. Second, in light of the many instances where internal security investigators went out of their way to find grounds for discharging stewards, even to the point of falsifying statements, it defies credulity to argue that the investigators were doing this without the knowledge and sanction of upper-echelon company officials. In fact, the record reveals numerous instances of investigations being initiated or supervised by the personnel department. Finally, we disagree with the implied premise of United Aircraft's argument: that it is not responsible for the acts of its investigators. As the Third Circuit stated in rejecting a similar argument where the company's president discharged an employee on the basis of false information from a company manager: 'to rule otherwise would provide a simple means for evading the Act by a division of corporate personnel functions.' Allegheny Pepsi-Cola Bottling Co. v. N.L.R.B., 312 F.2d 529, 531 (3d Cir. 1962). For these reasons, we uphold the Board's findings of discriminatory discharges in violation of section 8(a)(3).
 
 
 33
 We also hold that the evidence supports the Board's finding that the discharges of Gahagan, DeMerchant, Ardenski and Wiseman, and the suspension of Wing, violated section 8(a)(1) of the Act because they were not in fact guilty of misconduct. N.L.R.B. v. Burnup & Sims, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). United Aircraft produced no witnesses to counter the testimony of Gahagan and DeMerchant, and Trial Examiner Weil found them truthful. As recounted earlier, the case against Wing was furthered by altering Pegorer's affidavit, and Trial Examiner Peterson credited Wing's version over that of Pegorer upon a careful study of the entire testimony of each. Examiner Peterson's conclusion that steward Wiseman had not solicited union membership during working hours was also properly based on his evaluation of the conflicting testimoney of Wiseman and employee Mitchell. Moreover, Wiseman's two principal accusers in the investigation, Albert and Berube, had a motive to secure Wiseman's discharge, and neither was called as a witness.
 
 
 34
 Perhaps the most troubling finding is that steward Ardenski had not solicited during working hours. The company's investigative file reveals a simple conflict of credibility between Ardenski on the one hand, and Goyne and Winchell on the other. Goyne and Winchell claimed they had been solicited during working hours in May, 1968, whereas Ardenski said he solicited them during the lunch hour in February, 1968. Although the union authorization cards were dated for May, Ardenski testified that these cards were postdated by three months so as to give Goyne and Winchell time to withdraw their cards. The time cards of all three employees showed that in the relevant week ending May 12, they worked in the same department, but that Ardenski was in a different department during the week ending February 11. Ardenski's lunch hour was also different from that of Goyne or Winchell in February. While we might have decided in the company's favor as an original matter, we think that the Board's finding can be sustained because Goyne and Winchell did not testify at the hearing, the company failed to produce its detailed weekly timesheets which would show conclusively where Ardenski worked in February, and Examiner Peterson had a highly favorable impression of Ardenski which led him to credit both Ardenski's testimony and his diary entries for February 6 and May 9 that reflected his version. Additionally, when internal security first interrogated Ardenski and asked him what 'in name only' meant, he replied that this referred to his practice of postdating cards when a person could not join the union immediately. The trial examiner was entitled to weigh the likelihood that Ardenski could be so quick-witted and disingenuous.
 
 IV.
 
 35
 United Aircraft takes exception to the Board's finding, on review of Trial Examiner Weil's decision, of unlawful threats, promises of benefits, and interrogations, all in violation of section 8(a)(1).
 
 
 36
 We have no difficulty in sustaining the findings of unlawful threats and promises of benefits. Steward Menard, after his lengthy interrogation, was told by company investigators that 'they had heard of people who had quit the union, (and) the company had taken it into consideration.' Foreman Karlon, when asked by Menard, said 'it might help out' if he quit the union.[4] It was clearly unlawful for company personnel to tempt Menard into leaving the union in this manner. See N.L.R.B. v. Fitzgerald Mills Corp., 313 F.2d 260, 269 (2d Cir.), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963).
 
 
 37
 Foreman Grous told steward Vincent that wearing the blue steward's shirt and badge made him 'stick out like a sore thumb,' and that everyone would be watching him. Grous also told steward Williams that he should stop carrying union application cards in his shirt pocket because it looked bad, and that he should talk less so that it would not appear that he was conducting union business on company time. United Aircraft argues that Grous' comments to Williams and Vincent were mere 'friendly reminders,' but we think this was for the Board to decide. The fact that these are the sole incidents that occurred at the company's Hamilton Standard division does not compel a contrary result, since the probative value of this fact in establishing Grous' motivation or the effect of his statement on the employees is by no means clear.
 
 
 38
 We also think the Board properly found that the temporary confiscation of a union application card from shop steward Farrall was unlawful. Farrall and employee Jackson, who had just signed the card, were on their lunch hour. The company argues that foreman Bogdan had no way of knowing this at the time. Indeed, Bogdan returned the cards when he verified that both had been punched out for lunch. But we see no reason why Bogdan could not have asked them immediately whether they were out to lunch instead of acting in an abrupt and threatening manner.[5]
 
 
 39
 We have more difficulty with the Board's findings of unlawful and coercive interrogations. These interrogations were conducted by the internal security department while probing charges that company rules had been violated. Therefore, the five tests which we have heretofore applied in deciding whether interrogations exceed lawful bounds, which are set forth in the margin, may not be appropriate.[6] These factors are generally used in cases where the employer, faced with a union organizing campaign, interrogates employees regarding their union sympathies. See, e.g., N.L.R.B. v. Milco, Inc., 388 F.2d 133 (2d Cir. 1968). Where the investigation is directed at violations of valid plant rules, three of these factors will almost always be present: information is sought to be used against individual employees, the questioning is surrounded by an air or unnatural formality, and self-serving exculpatory replies are inevitable.
 
 
 40
 The N.L.R.B.'s brief proposes that we apply three tests to the interrogations here at issue: the employer must inform the employee of the reason for the interrogation, conduct the examination in an uncoercive manner, and confine it to the necessities of the purpose which legitimized the examination in the first place. In reply, United Aircraft protests that the Board is trying to impose a code of criminal procedure upon company investigations.
 
 
 41
 We find it unnecessary to decide whether the Board's three-pronged test should be applied to these interrogations, since we conclude for different reasons that in some instances the questioning exceeded legitimate bounds. As there was some unlawful questioning, the Board's order to cease and desist from 'coercively interrogating or intimidating employees in connection with their union membership, sympathies, or activities' should stand. As the Board concluded, these investigations frequently were 'conducted for the purpose of harassing the union stewards involved, making them realize that their union activities were being watched closely by the Respondent, and to garner enough evidence to support subsequent discharges.' In view of the discriminatory discharges which were the end result of so many of these investigations, the record abundantly supports the Board's conclusion. Since these interrogations were not conducted solely to determine whether the no-solicitation rule had been violated, but were also motivated by a desire to build up minimal and distorted records to lend colorable support for discharging union stewards, the cases of N.L.R.B. v. Southwire Co., 352 F.2d 346 (5th Cir. 1965), and Montgomery Ward & Co., 145 N.L.R.B. 846 (1964), enforced, 339 F.2d 889 (6th Cir. 1965), cited by United Aircraft, are not in point. In those cases, the interrogation was not intended to interfere with employees' section 7 rights.
 
 
 42
 Affirmatively, the Board's order should be sustained because it found instances of overt threats and improper questioning of protected activity generally. Perhaps the most salient illustration of an investigation aimed at harassing a union steward is that of Howard Rooney. Rooney thought that employee Joyce Carroll was leaving, so he went over to wish her farewell. During their conversation, she offered to return the union contract. Rooney's foreman, Cochran, asked Rooney what they were doing with a union book. When Rooney explained, Cochran said he was 'on thin ice' when he wore the union badge.[7] Cochran immediately questioned Carroll, who apparently verified Rooney's account. Nevertheless, first Carroll and then Rooney were interrogated by internal security personnel, and Rooney was asked repeatedly whether he was certain he had not been soliciting. No disciplinary action was taken. As in so many other instances, the company investigators apparently were seeking a basis for disciplining a union steward and were letting stewards know that they were being watched. Cf. N.L.R.B. v. United Mineral & Chem. Corp., 391 F.2d 829, 835-836 (2d Cir. 1968).
 
 V.
 
 43
 In their petition to review, the union petitioners contend that the Board erred in refusing to invalidate the company's no-solicitation rule and in refusing to find that employees were entitled to engage in union solicitation during paid nonworking time such as rest periods. The text of company Rule 5 and the collective bargaining agreement's no-solicitation provision are at note 2 supra.
 
 
 44
 The unions argue that the company's no-solicitation rule is not designed to serve legitimate company interests, but is used instead as an instrument to defeat union organization. Whereas the company has approved various employee solicitations, it has always come down hard on solicitation for the union. The unions' brief then counters the argument that they agreed to this in the collective bargaining agreement. They contend that the correct interpretation of the agreement is that union solicitation would be treated at least as favorably as other solicitations, that there was no clear and unmistakable waiver of the employees' 'fundamental right' to be free from 'discriminatory treatment,' and that in any case such waiver would be invalid. Regarding the Board's decision that employees could not solicit for the union during paid but nonworking time, the unions use essentially the same arguments of contract interpretation and no 'clear and unmistakable' waiver. The union petitioners also claim that Trial Examiners Weil and Peterson reached conflicting results on this point, and that the Board affirmed both.
 
 
 45
 We disagree with the unions' contentions. We cannot accept their characterizations of the issues, such as the presence of fundamental rights which must be clearly and unmistakably waived. Nor is the issue freedom from discrimination. Instead, the questions with which we are concerned are: (1) Does the collective bargaining agreement prohibit union solicitation during paid time when employees are not at work? (2) If so, should the agreement nevertheless be invalidated because of overriding public policy or because it has served as a pretext to dismiss union stewards while other solicitation unrelated to the union has been condoned? We answer the first question in the affirmative and the second question in the negative.
 
 
 46
 The collective bargaining agreement provides that there shall be no union solicitation 'during working hours.' This provision has appeared in United Aircraft's collective bargaining agreements for many years, and the company has consistently interpreted it to apply to all 'paid time,' which excludes lunch hours but not rest periods. The record shows union acquiescence over the years in the company's interpretation. Steward John Tardiff admitted on cross-examination that shop stewards were not to conduct union business on company time, except when they were punched out on the time card. Steward Clifford Nelson testified that when company investigators asked him whether he had solicited during company time, he answered: 'I never asked anybody to join the union on Company time because the union said the only time we can solicit people was before seven, after work or during lunch hours.' The company's interpretation of the meaning of 'working hours' was also upheld in 1958 by an arbitrator reviewing a discharge from the Southington plant. We therefore find that both parties understood that the ban on union solicitation extended to all paid time.
 
 
 47
 The unions argue that their acquiescence, if any, was the product of duress. But this provision long antedated the present dispute and was continually renewed. Furthermore, while the claim of 'duress' might explain why individual stewards would not solicit during rest periods, it cannot explain the union's failure over all these years to seek an authoritative adjudication of the clause's meaning from either an arbitrator or the Board. The unions also argue that this provision cannot be applied after a new contract was signed in 1966. The 1966 contract, entered into under the compulsion of a district court injunction, provided that the agreement shall not be deemed a waiver of any contention advanced before the Board. This begs the question. The unions did not abandon their legal argument, but that does not bar us from rejecting its merits.
 
 
 48
 The unions also raise their 'clear and unmistakable' waiver argument. We agree that as an original matter, the phrase 'working time' is ambiguous. The Board has held that in the absence of agreement, solicitation during all nonworking time is permissible, whether or not it is paid time. The unions argue that the ambiguous 'working time' is not a clear waiver. But the testimony at trial, arbitration decisions, and past practice of the parties have eliminated any ambiguity that might otherwise exist. In any case, the unions' characterization of the agreement as a waiver of 'fundamental rights' cannot be accepted. The union is free to solicit on company property before and after work and during the lunch hour.[8]
 
 
 49
 We see no reason to invalidate the clear agreement of the parties. The employees are in no way being deprived of their 'freedom from discrimination,' as the unions would have us believe. The mere fact that the company periodically allows solicitation for charities, gifts, and the like does not persuade us to reverse the Board's refusal to nullify the ban on union solicitation. See Serv-Air, Inc. v. N.L.R.B., 395 F.2d 557, 560 (10th Cir. 1968). Although this litigation reveals instances where the company used the no-solicitation ban as a pretext for discouraging union activities, we must remember, as United Aircraft's reply brief points out, that there are 25,000 employees and over 500 stewards in the plants involved. The company probably considered the no-solicitation ban to be an important bargaining objective, and the agreement should not lightly be overturned.
 
 
 50
 For the same reasons, we see no cause to nullify the company's Rule 5 barring 'gambling, taking orders, selling tickets, soliciting money or any other type of solicitation.' Rule 5, like the collective bargaining provision, was adopted many years before the present dispute arose. There is thus no evidence that the rule was adopted for the purpose of defeating union organization. Compare William H. Block Co., 150 N.L.R.B. 341 (1964). Cases brought to our attention by the unions' brief do not establish its argument that an overriding public interest is involved which weighs against finding a waiver of solicitation rights.[9] As stated earlier, we do not think the ban on solicitation during working hours unduly restricts the unions' access to its members, and the isolated instances of permitted solicitation-- charities and gifts-- is not the 'discrimination' with which the cases cited in the unions' brief are concerned. We therefore conclude that the Board properly found that company Rule 5 and the contract can be applied to prohibit solicitation for the union during working hours, whether or not the employee is working or resting.
 
 
 51
 We reject the unions' argument that the Board reached inconsistent results in the two cases. Trial Examiner Weil decided that United Aircraft could not forbid solicitation during paid time when the employees were not working, for example during rest periods. Trial Examiner Peterson reached the opposite conclusion, i.e., that the company could prohibit solicitation during all paid time. The Board affirmed Examiner Peterson in all respects. But it deleted that portion of Examiner Weil's proposed order reflecting his conclusion that union solicitation during nonwork time could not be barred.[10] Moreover, the Board did not adopt Examiner Weil's findings of section 8(a)(1) violations arising from discriminatory application of company rules or the contractual agreement. A review of the Board's opinion convinces us that its failure to state specifically that it was overruling Trial Examiner Weil's finding was inadvertent.[11]
 
 VI.
 
 52
 The unions' petition to review also protests the Board's dismissal of the section 8(a)(5) complaint. Trial Examiner Weil held that United Aircraft's refusal to honor employee requests for shop stewards to discuss grievances or to assist during questioning by the internal security office violated section 8(a)(5). On the basis of the intervening decision in Lodges 1746 and 743, I.A.M. v. N.L.R.B., 135 U.S.App.D.C. 53, 416 F.2d 809 (1969), cert. denied, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970), the Board found no violation. We agree.
 
 
 53
 It is necessary to set forth the background to the D.C. Circuit's opinion. In March 1966, the company withdrew recognition from the unions. The Board filed a complaint and, on August 5, 1966, secured an injunction under section 10(j) of the Act from Judge Clarie in the District of Connecticut ordering the company to resume bargaining. Hoban v. United Aircraft Corp., 264 F.Supp. 645 (D.Conn.1966). On September 29, 1966, the parties entered into a new two-year contract, and Judge Clarie dissolved the injunction. On November 27, 1967, the Board held that the company's withdrawal of recognition in March 1966, was unlawful. The D.C. Circuit denied enforcement, finding that the company had a reasonably grounded good-faith doubt of the unions' majority. In the instant case, the Board then held that since the unions did not enjoy majority status, the company was not obligated to call stewards.
 
 
 54
 Judge Clarie's order that the parties resume collective bargaining was entered even though it affirmatively appeared that the unions did not enjoy a majority. 264 F.Supp. at 649. His order recited the following:
 
 
 55
 'Resumption of collective bargaining with the unions by the respondent, pursuant to this decision or its agreement to a new employment contract, will not constitute a waiver of any rights which respondent may have to assert, in respect to a claimed lack of union majority status.'
 
 
 56
 Id. at 652. The 1966 contract reflected this 'no-waiver' understanding, and the company did not abandon its challenge to the unions' majority status until the unions offered to prove their majority during the November 1968 contract negotiations. In United Aircraft Corp. v. N.L.R.B., 434 F.2d 1198, we stated that the company's initial refusal to supply addresses in September 1968, was not an unfair labor practice although subsequent refusals were unlawful. Similarly, we think that the company's refusal to call stewards, which occurred before the dues checkoff cards established a majority at any of these plants, was not a violation of section 8(a)(5).
 
 
 57
 Union petitioners assert that regardless of the union's majority status, the company was under a duty to bargain in good faith during the 1966-68 period. That duty continued until the D.C. Circuit's decision in 1969. Consequently, they argue, the company's action was unlawful, and a contrary ruling would be inconsistent with the well-established rule that injunctions must be obeyed until overturned. While we agree with this general principle and note that the unions might have been able to secure redress at the time either before the district court or through arbitration under the 1966 contract, we do not agree that this possible case of contempt or breach of contract is an unfair labor practice. The gravamen of a section 8(a)(5) violation is still an unlawful refusal to bargain, despite the gloss that the case law has placed on the section. Even though a refusal to call stewards might be deemed a 'refusal to bargain,' an issue we need not decide, there can be no unfair labor practice without a duty to bargain. The D.C. Circuit held that there was no such duty, and we have held that no such duty arose until late 1968. We do not think that because the company's conduct is otherwise unlawful, it must also be deemed an unfair labor practice. Moreover, the above-quoted provision of Judge Clarie's decision and order recognizes that the company retained its defenses arising from the unions' minority status.[12]
 
 
 58
 It is also argued that if the union did lose its majority in the relevant period, that loss was caused by United Aircraft's prior unfair labor practices. The unions inform us that in yet another round of litigation between the parties, a trial examiner has issued a decision, dated July 25, 1969, finding that United Aircraft violated section 8(a)(3) by not reinstating strikers discharged during the violence-ridden strike of 1960. The unions therefore ask us to remand to the Board with instructions to await its decision in that case if we conclude that the existence of a majority is determinative. We decline to do so.
 
 
 59
 We hold that the proceedings culminating in the D.C. Circuit's decision bars by collateral estoppel the unions' attempt to show that it lost its majority because of United Aircraft's unlawful refusal to rehire striking workers. In those proceedings, the unions made the same argument before the Board. The Board rejected this contention, although it found that the company did not have a good-faith doubt of the unions' majority. The unions could have petitioned to review this determination, but did not. In denying enforcement, the court specifically noted: 'Significantly, the Board here found no independent unfair labor practices or other conduct aimed at causing disaffection from the Unions.' Lodges 1746 and 743, I.A.M. v. N.L.R.B., 135 U.S.App.D.C. 53, 416 F.2d 809, 814 (1969), cert. denied, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970). Since both the Board and the court had to rule on whether prior unfair labor practices vitiated the company's good-faith doubt, and the union could have sought review of the Board's adverse determination on this issue, the general rule that 'determinations adverse to the winning litigant do not have conclusive effect as collateral estoppel' should not be applied. 1B Moore, Federal Practice P0.443(5), at p. 3923 (1965); see F. James, Jr., Civil Procedure 583 (1965); Developments in the Law-- Res Judicata, 65 Harv.L.Rev. 818, 846-47 (1952). To hold otherwise would defeat the policy of having matters finally settled as expeditiously and economically as possible, for a party would be able to bring new litigation on any claim that was rejected by the Board, provided the Board ruled in his favor on other grounds. There would be no point for the Board to entertain new litigation between the same parties raising the same issue it has already decided.
 
 VII.
 
 60
 Two issues raised by United Aircraft's petition for review remain to be considered.
 
 
 61
 First, United Aircraft argues that the Board should have required the unions to arbitrate their complaints regarding the disciplinary action taken against stewards. The company is unable to cite any case to support its position, and precedent is clearly to the contrary. N.L.R.B. v. Strong, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969), is directly in point. Justice White there stated:
 
 
 62
 'Firing an employee for union membership may be a breach of contract open to arbitration, but whether it is or not, it is also an unfair labor practice which may be remedied by reinstatement with back pay under 10(c) even though the Board's order mandates the very compensation reserved by the contract.'
 
 
 63
 393 U.S. at 362, 89 S.Ct. at 545. See also Lodge 743, IAM v. United Aircraft Corp., 337 F.2d 5 (1964), cert. denied, 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).
 
 
 64
 We also note that if the Board had declined to entertain these claims, arbitrators deciding individual cases may never have found the general pattern of anti-union activity which is now revealed to us. While in appropriate cases the district court can order the union to arbitrate a claim of unlawful discharge despite the fact that an unfair labor practice charge is pending, United Aircraft Corp. v. Canel Lodge No. 700, IAM, 436 F.2d 1 (2d Cir. 1970), the jurisdiction of the Board and the arbitrator is concurrent, and the arbitration clause does not oust the Board of jurisdiction.
 
 
 65
 Second, United Aircraft contends that the Board's order is overly broad, because it requires posting of identical notices at all of the company's six Connecticut plants. The argument is without merit. Unfair labor practices were found at five of these six plants, all are located in a limited and compact area, and the many unfair labor practices follow a general pattern of anti-union hostility and discriminatory conduct. Accordingly, United Aircraft's attempt to distinguish J. P. Stevens & Co. v. N.L.R.B., 380 F.2d 292 (2d Cir. 1967), where we approved an order that the company post notices in all 43 of its North and South Carolina plants when violations occurred at only 20 plants, must fail. For the same reasons, we find nothing objectionable with the provision of the Board's order broadly proscribing interference, coercion, and restraint of the workers' section 7 rights.
 
 
 66
 Petitions for review denied and Board's orders enforced.
 
 
 
 *
 United States Supreme Court, retired, sitting by designation
 
 
 [1]
 'United Aircraft' as used herein refers to the four Connecticut plants of the Pratt & Whitney Division-- East Hartford, Manchester, Southington, and Middletown-- and the two Connecticut plants of the company's Hamilton Standard division, Windsor Locks and Broad Brook
 
 
 [2]
 Company Rule 5 forbids 'gambling, taking orders, selling tickets, or soliciting money or any other type of solicitation.' The collective bargaining agreement includes the following provision:
 'There shall be no solicitation of employees for union membership or dues conducted on the premises of the Company during working hours by the union, its representatives, or by employees.'
 
 
 [3]
 'Union stewards,' unlike shop stewards, do not handle grievances. Their function is to act as a liaison between the men in their departments and the shop stewards, to help organize, to disseminate information, and otherwise to assist shop stewards
 
 
 [4]
 United Aircraft argues that the Board's finding is not supported by substantial evidence because Menard's testimony was contradicted by Karlon, and the trial examiner concluded that they were both unreliable witnesses. The trial examiner's refusal to credit a portion of Menard's testimony, however, does not preclude him from believing the balance of that testimony
 
 
 [5]
 Trial Examiner Peterson held that the confiscation of Pegorer's card in the incident that led to Wing's suspension was not an unfair labor practice, since this occurred during working hours. The union does not question this finding
 
 
 [6]
 In the absence of explicit threats, the lawfulness of an interrogation is evaluated in light of the following factors: (1) Background-- is there a history of hostility and discrimination? (2) Nature of the information sought-- e.g., did the interrogator appear to be seeking information on which to base taking action against individual employees? (3) Identity of questioner. (4) Place and method of interrogation-- e.g., is there an air of unnatural formality? (5) Truthfulness of reply. N.L.R.B. v. Milco, Inc., 388 F.2d 133, 137 (2d Cir. 1968); Bourne v. N.L.R.B., 332 F.2d 47 (2d Cir. 1964)
 
 
 [7]
 Cochran testified that his 'thin ice' remark was related to Rooney's poor work performance, but the trial examiner concluded otherwise
 
 
 [8]
 Since we have decided that United Aircraft must furnish to the unions the employees' names and addresses, United Aircraft Corp. v. N.L.R.B., 434 F.2d 1198, enforcement of the collective bargaining agreement will not severely limit union activities. We there noted that the company's strict ban on union solicitation or conducting union business during paid time severely restricted the efficacy of stewards as an alternative to furnishing names and addresses. We are not disposed to turn around and hold the ban on solicitation to be unlawful because the unions did not have the employees' names and addresses
 
 
 [9]
 Wallace Corp. v. N.L.R.B., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944), entailed company discharges in collaboration with the union. Radio Officers' Union, etc. v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 445 (1954), dealt with contracts which discriminated in wages or other benefits solely on the basis of union membership. Seemingly more relevant, bacause they involve solicitation or distribution of literature, are cases such as IAM, District 9 v. N.L.R.B., 415 F.2d 113 (8th Cir. 1969); and N.L.R.B. v. Mid-States Metal Products, Inc., 403 F.2d 702 (5th Cir. 1968). But these cases dealt with broad bans on solicitation or distribution anywhere in the plant. The Fifth and Eighth Circuits, concerned about the effect of those agreements on the workers' rights to change their bargaining agent, invalidated these provisions. Contra, N.L.R.B. v. Gale Products, 337 F.2d 390 (7th Cir. 1964); Armco Steel Corp. v. N.L.R.B., 344 F.2d 621 (6th Cir. 1965). See also Mason & Hanger-Silas Mason Co. v. N.L.R.B., 405 F.2d 1, 4-5 (5th Cir. 1968), upholding a contractual rule against conducting union business during working hours. Unlike these cases, we are not dealing with agreements prohibiting all solicitation on company premises, and no claim is made that a rival union is being favored
 
 
 [10]
 The deleted paragraph 1(e) of Examiner Weil's proposed order directed the company to cease and desist from 'promulgating and enforcing rules against talking about the Union or conducting Union business on company time in order to interfere with union organization or enforcing such rules while permitting other types of talking or soliciting on company time.' The unions' reply brief argues that this provision did not relate to the trial examiner's conclusion that not all 'paid time' is 'working time,' but they are unable to point to any other provision that is relevant. Moreover the deleted provision's reference to 'soliciting' persuasively rebuts the unions' argument
 
 
 [11]
 The Board also impliedly refused to accept Trial Examiner Weil's conclusion that the company could not forbid discussing union business (as distinguished from soliciting for the union) during company time. We agree with the Board. Company Rule 4 prohibits 'loafing, idleness, during working hours,' and starting work too late or stopping early. Rule 11 forbids 'doing personal work.' Even without these rules, of course, the company can insist that union business not be conducted while the men are at work, and the absence of a contractual provision to that effect is of no consequence. See Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945)
 
 
 [12]
 The unions' reply brief argues that this position is inconsistent with our holding that the company's use of the no-solicitation rule to curb union solicitation during all paid time did not violate section 8(a)(1). They contend that if the union did not represent a majority, the employees could not be bound by the contract. But the union agreed to curb solicitations for its own benefit, the company acted accordingly, and thus there was no unfair labor practice. Here, the question is whether the company's failure to abide by a contractual provision is an unfair labor practice, and more specifically, an unlawful refusal to bargain under section 8(a)(5)