**LODGES 1746 AND 743, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

United Aircraft Corporation, Intervenor.

**UNITED AIRCRAFT CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Lodges 1746 and 743, International Association of Machinists, and Aerospace Workers, AFL–CIO, Intervenors.

Nos. 21469, 21690.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 15, 1968.

Decided May 29, 1969.

Petition for Rehearing Denied July 9, 1969.

Mr. Mozart G. Ratner, Washington, D. C., with whom Mr. Plato E. Papps, Washington, D. C., was on the brief, for petitioners in No. 21,469 and intervenors in No. 21,690.

Mr. John A. McGuinn, Washington, D. C., for petitioner in No. 21,690 and intervenor in No. 21,469. Mr. Joseph C. Wells, Washington D. C., with whom Mr. Guy Farmer, Washington, D. C., was on the brief, for petitioner in No. 21,690 and intervenor in No. 21,469.

Mr. Edward E. Wall, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Glen M. Bendixsen, Atty., National Labor Relations Board, were on the brief, for respondent.

Before WILBUR K. MILLER, Senior Circuit Judge, and DANAHER *, and McGOWAN, Circuit Judges.

PER CURIAM:

These consolidated cases include No. 21469, a petition to review filed by the Unions, and No. 21690, the Company's petition to review and the Board's cross-petition to enforce the Board's Decision and Order, 168 N.L.R.B. No. 66. The Board had found that when the Company on March 10 and 11, 1966, withdrew recognition from and thereafter refused to bargain with the Unions, Lodges 1746 and 743, International Association of Machinists and Aerospace Workers, it did not do so because of an adequately based good faith doubt of the Unions' majority status.

I

Following elections in 1945 and 1957 respectively, in two of the Company's Connecticut Divisions, Lodge 1746 was certified as the bargaining representative of employees in the East Hartford and Manchester plants of United Aircraft Corporation's Pratt & Whitney Division. Lodge 743 was likewise certified in 1941 and 1954 in the Windsor Locks and Broad Brook plants of the Company's Hamilton Standard Division. With rare interruptions, all four plants have been continually covered by contracts between the Lodges and the Company.

A bitter and violent strike in 1960 culminated in the filing of unfair labor

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

practice charges and mammoth back pay claims against the Company. In addition, private lawsuits were instituted by the Unions alleging violations of a strike settlement agreement, and by the Company, claiming loss of profits flowing from picket-line misconduct. Following the strike, there was a substantial drop in voluntary checkoff authorizations at each plant.

The parties met on October 1, 1965, to commence negotiations for new contracts. At the outset, the Company's chief negotiator raised the point that the Union did not represent a majority of either Division of the Company, and asserted his belief that it represented only 10 per cent of the employees. Even so the parties went forward with negotiations on various fronts, including "off-the-record" discussions concerning settlement of the still-pending litigation growing out of the 1960 strike. By early December, 1965, agreement was reached on all economic matters, and several extension agreements were executed with Lodge 1746, incorporating the new economic terms and continuing the non-economic terms of the previous contract which by its terms was due to expire November 30, 1965.

Subsequent talks concentrated on settlement of the litigation and some form of union security clause. After three months of discussions, the chief Union negotiator, Oehler, met with the presidents of Lodges 1746 and 743 and informed them of the areas in which he thought agreement could be reached. The presidents of the Locals responded that such an agreement would be a "sell-out" and instructed him instead to present a list of 21 demands, most of them, as the Trial Examiner found, far in excess of previous Union proposals. Included in the list were demands for compulsory union membership and immediate payment of $22.5 million in back pay settlement. Certain that these demands would be unsatisfactory to the Company, Oehler stated that he had "no alternative but to go back to the Company the next morning and * * * blow it with the 21 point proposal."

As Oehler anticipated, the Company on March 2, 1966, rejected such demands, and negotiations collapsed. The president of Lodge 1746 thereupon suggested to the Company that the economic terms which had been worked out in December be incorporated into a new three-year contract to be subject to the outcome of all pending litigation. The Company responded by informing both Lodges, on March 10 and March 11 respectively, that it would decline to deal with them further until they demonstrated their majority status. The Unions then filed the instant refusal to bargain charges.[1]

The Board, adopting the Trial Examiner's findings, conclusions, and recommendations, found that the Company violated section 8(a) (5) and (1) by withdrawing recognition from, and thereafter refusing to bargain with, the Lodges. We hold that tested by applicable criteria and the principles to be discussed, this finding lacks the support of substantial evidence on the record considered as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950).

## II

The legal principles relating to withdrawal of recognition of a bargaining representative are well settled. Absent special circumstances, the union enjoys an irrebuttable presumption of majority status for one year after certification.[2] Thereafter, the presumption con-

1. Acting upon these charges, the General Counsel sought an injunction under § 10(j) restraining the Company from refusing to bargain pending the outcome of this case. After a hearing on the merits, Judge Clarie granted the relief sought and recited in detail findings of pertinence to an understanding of the background here. Hoban v. United Aircraft Corp., 264 F.Supp. 645 (D.Conn.1966).

2. E.g., NLRB v. Gulfmont Hotel Co., 362 F.2d 588 (5 Cir. 1966); Stoner Rubber Co., 123 N.L.R.B. 1440 (1959); Celanese Corp., 95 N.L.R.B. 664 (1951).

tinues but becomes rebuttable[3] upon a showing of "sufficient evidence to cast serious doubt on the union's continued majority status."[4] At that point, the burden shifts to the General Counsel to prove that, on the critical date, the union in fact represented a majority of the employees.[5]

No evidence was introduced to prove the Unions' majority status. Such proof was here deemed unnecessary to make out a refusal to bargain, since the Company, in the Board's view, was unable to rebut the continuing presumption of majority status. We disagree.

■ The pertinent standard, "serious doubt," has two components: a reasonable basis in fact, and good faith.[6] The Trial Examiner found that neither element was shown by the Company.

### 1. *Reasonable basis in fact.*

The Company points primarily to the sharp decline, following the 1960 strike, in the percentage of employees authorizing checkoffs. Dismissing this factor as an unreliable barometer of employee sentiment, the Board cites NLRB v. Gulfmont Hotel Co., 362 F.2d 588 (5 Cir. 1966), where the court found "no neces-

sary connection between the checkoff list and the number of union supporters."[7] As stated by the Trial Examiner:

With the successive contracts imposing no obligation upon them to join the Union at all, a more persuasive inference is that the employees found matters to their liking, and were perfectly willing to remain free riders, having the Union as their agent without cost.

Had the voluntary checkoff authorizations remained relatively stable, as in *Gulfmont*, we would be inclined to agree with the Board. But here there was a substantial *decrease* in those authorizations, which might reasonably be viewed as reflecting a proportionate decline in the extent of union support. Convair Div. of Gen. Dynamics Corp., 169 N.L.R.B. No. 26 (1968).[8]

■ There were other grounds for doubt. In 1964 the Company came into possession of a memorandum dated November 20, 1962, from the Unions' attorney to the International's president advising against settlement of pending litigation. Among his reasons were the following:

[A]ssuming the case were settled and we had not completed negotiations of

---

3. In addition to cases cited in note 2 *supra*, see NLRB v. Downtown Bakery Corp., 330 F.2d 921 (6 Cir. 1964) ; Bally Case & Cooler, Inc., 172 N.L.R.B. No. 106 (1968) ; *cf.* Retail Clerks Int'l Ass'n, AFL–CIO v. NLRB, 125 U.S.App.D.C. 389, 373 F.2d 655 (1967).

    The Company's contention in the instant case that the General Counsel bears the threshold burden of proving the Unions' majority status is clearly without merit. *See* NLRB v. John S. Swift Co., 302 F.2d 342 (7 Cir. 1962).

4. Stoner Rubber Co., *supra* note 2, at 1445 ; *accord*, NLRB v. John S. Swift Co., *supra* note 3.

5. See cases cited in note 4 *supra*.

6. NLRB v. Downtown Bakery Corp., *supra* note 3 ; Lloyd McKee Motors, Inc., 170 N.L.R.B. No. 140 (1968) ; *see, e.g.*, Bally Case & Cooler, Inc., *supra* note 3 ; Convair Div. of Gen. Dynamics Corp., 169 N.L.R.B. No. 26 (1968) ; Celanese Corp., *supra* note 2, cited with approval in Brooks v. NLRB, 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125, n.18 (1954).

    Of course, different rules apply when the charge is refusal to bargain with an *uncertified* union. In that case, a violation must be predicated upon two findings: that a majority of the unit have freely designated the union as bargaining agent, and that the company's denial of recognition is not in good faith. Amalgamated Clothing Workers of America AFL–CIO v. NLRB, 124 U.S.App.D.C. 365, 365 F.2d 898 (1966). Consequently, an employer's motivations become relevant only if in fact the union represents a majority. NLRB v. Arkansas Grain Corp., 390 F.2d 824 (8 Cir. 1968) ; NLRB v. S. E. Nichols Co., 380 F.2d 438 (2 Cir. 1967).

7. 362 F.2d at 592.

8. The checkoff rate may take on importance in other contexts as well. *Compare* NLRB v. Howe Scale Co., 311 F.2d 502, 505 (7 Cir. 1963), where a *high* percentage of voluntary checkoffs was held to be evidence of a *lack* of reasonable doubt concerning majority status.

our [1962] contract, I am certain that the Company would file an 'RM' petition on the grounds that it has a good faith doubt that we represent a majority of the employees—which we don't.

Such an admission alone may be an important factor constituting a reasonable basis for doubt. Universal Life Ins. Co., 169 N.L.R.B. No. 165 (1968); Poray, Inc., 160 N.L.R.B. 697 (1966).

■ In view of this statement, taken together with other admissions, tacit and express,[9] and with the substantial decrease in checkoffs, the Company might well have entertained a *reasonably* based doubt as to the Unions' majority status.[10]

2. *Good faith.*

■ To overcome the presumption, however, the Company must have asserted that doubt in good faith. Since an affirmative showing of this nature is ordinarily not feasible, good faith may, absent evidence to the contrary, be inferred from the existence of a reasonable basis for doubt.

The Trial Examiner, finding contrary evidence to be ample, not only declined to infer good faith but also specifically found bad faith. The Trial Examiner would fault the Company for not precipitating a definite issue as to the Unions' majority status when the Company was already aware of the substantial checkoff decrease and was cognizant at least

of some of the Unions' admissions as to their minority status. Instead of recognizing the existence of a reasonable basis for doubt, the Trial Examiner exalted the facts that the Company agents had been bargaining with the Unions' representatives, had negotiated with them for five months, reached an interim agreement, and were prepared to sign a new contract. The Trial Examiner took into account such factors, and the fact that the Company had regularly negotiated contracts with the two locals for 10 and 20 years, respectively.

■■ In support of this finding, the Board here urges upon us that the Company's withdrawal of recognition, timed as it was, could not have been in good faith.[11] As a general proposition, we agree that the appropriate time for a withdrawal of recognition based on reasonable doubt of a union's majority status is when the union demands bargaining for new contract.[12] To permit an employer to "save" his doubts for use at his convenience might subvert the bargaining process by providing him with a club to hold over the heads of the union negotiators. On the other hand, merely entering negotiations does not always constitute a waiver of the employer's doubts,[13] and "old" grounds for doubt are not always stale.[14] Where, as here, the employer has raised the issue of majority status from the start of ne-

9. The Company on a number of occasions questioned the Unions' majority status, but no Union official responded to the challenges. In addition, the International's president in pressing his demand for a union security clause during the 1965 negotiations, insisted that it was a union's only hope of building itself up to majority status.

10. Indeed, further evidence to support such a doubt might have been adduced had the Trial Examiner not precluded for remoteness all reference to events surrounding the 1960 strike and subsequent Union harassment of employees who crossed the picket lines.

11. In granting the injunction against the Company, Judge Clarie assigned particular significance to this matter of timing.

See Hoban for and on Behalf of N.L.R.B. v. United Aircraft Corp., *supra* note 1, 264 F.Supp. at 651, 652.

12. *See* Bally Case & Cooler, Inc., *supra* note 3; J. C. Penney Co., 162 N.L.R.B. 1553 (1967), enforced, 391 F.2d 935 (6 Cir. 1968); *cf.* Poray, Inc., 160 N.L.R.B. 697 (1966) (discussing "staleness" of the employer's doubts).

13. *Cf.* Suburban Drugs, Inc., 138 N.L.R.B. 787 (1962).

14. Poray, Inc., *supra* note 12. A rule requiring the earliest feasible assertion of a reasonable doubt might cause a premature rupture in the bargaining relationship by precluding an employer from entering a new contract in the expectation that the union will soon bolster its status.

gotiations,[15] and where old grounds for doubt have been freshly confirmed by union admissions,[16] little basis remains to support an inference of bad faith because of Company bargaining in an effort to achieve industrial peace if possible. Indeed the Supreme Court has observed—even where the employer has "fair doubts about the union's continuing majority"—the better practice is for the employer to keep bargaining and to petition the Board for a new election or other relief. That is precisely what the Company here had urged.[17]

It is important to note additionally that the Unions here knowingly "blew" the negotiations by submitting demands they recognized as clearly unacceptable.[18] With the proceedings in this unique posture, the slate in effect was wiped clean.

It was not then inappropriate for the Company to reassess the Unions' majority status and to assert its doubt as if negotiations had never commenced. This concept is not new, either in our view or that of the Board. For example, in Lloyd McKee Motors, Inc., 170 N.L.R.B. No. 140 (1968), the Board treated a somewhat different set of unusual circumstances as justifying a withdrawal of recognition after five months of bargaining. Here, as in *McKee*, there was nothing to indicate that the employer intended to avoid reaching final agreement with the union.[19] Significantly, the Board here found no independent unfair labor practices or other conduct aimed at causing disaffection from the Unions.

In sum, the Company's showing was sufficient to overcome the presumption by casting "serious doubt" upon the Unions' majority status.[20] Since the record lacks evidence that the Unions in fact enjoyed such status, the refusal-to-bargain finding is without support and enforcement must be denied.[21]

The Petition to review in No. 21690 is granted, and the Cross Petition to enforce is denied. Accordingly this disposition renders moot the Petition to review in No. 21469.

So ordered.

McGOWAN, Circuit Judge (dissenting):

The majority opinion states quite correctly, I believe, the principles which govern the propriety of a withdrawal of bargaining recognition, i.e., a reasonable basis in fact to doubt the existence of a majority, and a good faith assertion of that doubt. My difference with my colleagues is solely as to whether there is adequate evidentiary support for the Board's finding in No. 21,690 that the timing of the employer's claim of doubt admitted of the conclusion that it was intended to serve purposes other than merely denying the unions' right to speak for a majority of the employees. I think the facts of record made that a permissible, if not a necessary, inference; and it is only the former that is needed to foreclose judicial rejection of the Board's determinations.

Petitioners were old and familiar faces at the employer's plant and bargaining

---

15. *Cf.* Suburban Drugs, Inc., *supra* note 13. *Compare* J. C. Penney Co., *supra* note 12; Jem Mfg., Inc., 156 N.L.R.B. 643 (1966); Kellogg's, Inc., 147 N.L.R.B. 342 (1964), enforced, 347 F.2d 219 (9 Cir. 1965).

16. *See* Poray, Inc., *supra* note 12.

17. Brooks v. NLRB, *supra* note 6, 348 U.S. at 104, 75 S.Ct. 176, n.18.

18. *Compare* Bally Case & Cooler, Inc., *supra* note 3, where the *employer* injected a proposal calculated to be rejected by the union.

19. *Compare id.*

20. Judge Clarie noted in Hoban v. United Aircraft Corp., *supra* note 1, that the parties there had conceded that the unions possessed only a minority status.

21. We find no merit to the Unions' assertions that the Board should have made additional findings.

In light of our disposition, we need not reach the question of the adequacy of the Board's remedial order.

table. The severe troubles of the 1960 strike undoubtedly produced a lot of freeloaders in the form of new employees who were happy to have the unions negotiate increased benefits for them without themselves paying union dues. There is nothing to suggest that the employer would have welcomed a new union in place of petitioners, who had been around so long; and the employer was, without any visible concern about petitioners' possible minority status, ready to sign an agreement on terms reached after several months of bargaining, *provided* that the unions settled their lawsuits deriving from the strike.

The conditions were, thus, certainly present for a use of the threat of withdrawing bargaining recognition to achieve an objective unrelated to majority or minority status. The conclusion drawn by the Board from these circumstances is within a zone of inferential reasonableness, and I would, with all respect, let it alone.