Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 7, 2003          Decided June 20, 2003

No. 01-1491

MCDONALD PARTNERS, INC.,
D/B/A RODGERS & MCDONALD GRAPHICS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

COMMUNICATIONS WORKERS OF AMERICA, LOCAL 14904,
SOUTHERN CALIFORNIA TYPOGRAPHICAL AND MAILER UNION,
AFL–CIO–CLC,
INTERVENOR

———

On Petition for Review and Cross–Application for
Enforcement of an Order of the National
Labor Relations Board

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Harry R. Stang* argued the cause for petitioner. *Jamie L. Johnson* was on the briefs. *Rodney F. Page*, *Tina R. Tyson* and *William C. Edgar* entered appearances.

*Kira Dellinger Vol*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Sharon I. Block*, Supervisory Attorney. *Jeffrey M. Hirsch*, Counsel, entered an appearance.

*Mark F. Wilson* argued the cause for intervenor. *Ellen Greenstone* and *Richard Rosenblatt* were on the brief.

Before: RANDOLPH and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* ROGERS.

RANDOLPH, *Circuit Judge*: Rodgers & McDonald Graphics, a Los Angeles area commercial printer, refused to bargain with the Communications Workers of America, Local 14904, AFL–CIO–CLC ("Local 14904"), after a collective bargaining agreement expired, claiming that it had a good-faith reasonable doubt of the union's majority status. The National Labor Relations Board rejected the claim and held that the company's refusal to bargain violated Section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5). *McDonald Partners, Inc.*, 336 N.L.R.B. No. 74, 2001 WL 1261811, at *1, *4 (Oct. 1, 2001). The company petitions for review and the Board cross-applies for enforcement of its affirmative bargaining order.

On the expiration of a collective bargaining agreement, the incumbent union enjoys a presumption of majority status. *Auciello Iron Works v. NLRB*, 517 U.S. 781, 786 (1996). In the past, an employer could rebut the presumption by showing that when it refused to bargain it had a good-faith reasonable doubt of the union's majority support. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 367–68 &

n.2 (1998); *Auciello*, 517 U.S. at 786–87. After the Court's *Allentown Mack* decision, the Board altered its standard prospectively: in the future, employers may justify withdrawal of recognition from an incumbent union only by showing that the union did not in fact have the support of a majority of employees. *Levitz Furniture Co. of the Pac.*, 333 N.L.R.B. No. 105, 2001 WL 314139, at *2 (Mar. 29, 2001). This case was pending at the time of the Board's *Levitz* decision and, under *Levitz*, the reasonable doubt standard therefore applied. *Id.* at *18; *see, e.g.*, *Marion Hosp. Corp. v. NLRB*, 321 F.3d 1178, 1186 (D.C. Cir. 2003). The question before us is whether the Board committed legal error in refusing to consider some of the employer's evidence, submitted in support of its claim of good-faith doubt.

Although the company's refusal to bargain occurred in the summer of 1998, after a collective bargaining agreement had expired, the company sought to establish its doubt about the union's majority status on the basis of evidence that began to accumulate years earlier. Before 1997, Southern California Typographical and Mailer Union Local 17, affiliated with Local 14917 of Communications Workers of America, AFL–CIO–CLC ("Local 17"), represented the company's employees. The bargaining unit consisted of about 100 individuals working in various parts of the operation. In 1992, Local 17 and the company signed an agreement containing a union shop clause, a type of union security clause requiring all employees covered by the agreement to become and to remain union members. *See* 29 U.S.C. § 158(a)(3); *Pac. Northwest Newspaper Guild, Local 82 v. NLRB*, 877 F.2d 998, 999 (D.C. Cir. 1989); *Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. v. NLRB*, 675 F.2d 1257, 1269 (D.C. Cir. 1982). The agreement also contained a dues checkoff clause, requiring the company, on written authorization by an employee, to deduct union dues from the employee's wages and remit them to the union. *See* 29 U.S.C. § 186(c)(4).

An unspecified number of employees submitted dues checkoff authorizations under the contract. In November 1994, for reasons not in the record, Local 17 terminated the agreement

and offered to negotiate a new one. In the meantime, the company stopped honoring the dues checkoff authorizations. Between November 1994 and June 1995 (while no agreement was in effect), the company's president, Doyle McDonald, gathered from frequent conversations with various employees a "universal . . . lack of kindness towards the union." During the same time period, Cynthia Termath, an employee who served as one of two union stewards, told McDonald that most employees had lost confidence in the union, did not think it was representing them well, no longer wanted the union to represent them, and were generally dissatisfied with it. Termath gained her information from her conversations with other employees. Ignacio Burgos, the other union steward, also told McDonald between November 1994 and July 1995 that the employees were dissatisfied with the union. In addition, company managers informed McDonald that there was a "lack of interest" in the union among employees.

In July 1995, Local 17 and the company signed a new agreement, effective until May 1998. The new agreement also contained a dues checkoff clause. But the union shop clause was replaced with a maintenance-of-membership clause, allowing employees to choose whether to join the union but requiring those who became members to remain members for the duration of the agreement. *See Int'l Union*, 675 F.2d at 1269.

No employee submitted a dues checkoff authorization under the new contract. Within months after the agreement was signed, Termath told McDonald that she had resigned from the union because she was dissatisfied with it; that she had heard from about sixty other employees in the bargaining unit that they were dissatisfied with union representation and "perfectly happy with pulling out of the union and . . . exercising their right . . . to not belong to the union any more"; that to her knowledge, none of the employees in the bargaining unit were still members of the union; and that, as far as she knew, no one in the unit had reauthorized dues checkoff. Company managers also informed McDonald that they knew of no employees in their departments who continued to be union members in good standing after July 1995.

Because of the lack of dues-paying members, on March 4, 1996, the company lost its license to use a union association label (a graphic called a "bug") on its products.

At the end of December 1996, Local 17 merged with Local 14904. Members of the two locals were eligible to vote on the merger. Apparently, none of the company's employees voted. Neither they nor the company were informed of the merger until sometime in late January 1997.

In support of its reasonable doubt claim, the company presented this evidence (all of which the company claims to have known when it refused to bargain in the summer of 1998) and other evidence we need not recount. The Administrative Law Judge, whose findings and conclusions the Board affirmed without modification, 2001 WL 1261811, at *1, refused to consider any evidence predating the formation of the 1995–98 contract. 2001 WL 1261811, at *14. According to the ALJ, the Supreme Court's *Auciello* decision meant that once an employer enters into a collective bargaining agreement, it may never—"throughout the term of the contract and after its expiration"—rely on evidence predating the contract to support an asserted good faith doubt. *Id.* The Board, over the dissent of Chairman Hurtgen, affirmed, citing *Flying Dutchman Park, Inc.*, 329 N.L.R.B. 414, 417 (1999). *Id.* at *1 n.2.

We disagree with the Board's interpretation of *Auciello*, an interpretation to which we owe no deference, *New York New York v. NLRB*, 313 F.3d 585, 590 (D.C. Cir. 2002). The employer in *Auciello* attempted to repudiate a collective bargaining agreement the day after entering into it, on the basis of doubts about the union's majority support arising from evidence known to the employer before it signed the agreement. 517 U.S. at 782–83. The Court held that the Board need not make an exception to its usual irrebuttable presumption of union majority status during the term of a collective bargaining agreement, up to three years. *Id.* at 786–87. This conclusive presumption—which does not apply here because the contract had ended—arises not from an absolute certainty that the union continues to enjoy majority

status, but from the National Labor Relations Act's purpose of fostering industrial peace by promoting stable collective bargaining relationships. *Id.* at 785–90. The conclusive presumption allows "a union to concentrate on . . . fairly administering a collective-bargaining agreement without worrying about the immediate risk of decertification" and takes away "any temptation on the part of the employer to avoid good-faith bargaining in an effort to undermine union support." *Id.* at 786 (citation and internal quotation marks omitted).

Nothing in that rationale bars employers from relying on pre-contract evidence. The logic of *Auciello* is that for the first three years of the contract, the presumption is irrebuttable no matter what evidence the employer might wish to offer. The bar has nothing to do with when the evidence arose. When the three-year period passes or the contract expires, the presumption becomes rebuttable, and all evidence—again, regardless of when it arose—may potentially be relevant to the employer's good faith doubt. Neither *Auciello* nor *Flying Dutchman*, which simply reiterated *Auciello*'s reasoning, 329 N.L.R.B. at 417, provides any basis for dismissing pre-contract evidence out of hand.

Having excluded the pre-contract evidence, the ALJ found the remaining evidence insufficient to support a reasonable doubt. 2001 WL 1261811, at *14–16. With respect to union membership, including the loss of the union bug, and dues checkoffs, the ALJ stated that the Board traditionally had disregarded declines in union membership or dues checkoffs as grounds for a reasonable doubt. *Id.* at *16. As the ALJ saw it, the Board has considered these factors irrelevant to the issue of majority support because employees may desire union representation even though they do not belong to the union or pay dues. *Id.* Alternatively, the ALJ thought that even if the membership and dues checkoff declines were relevant, the evidence (dating from 1995 and 1996) had grown "stale and unreliable" by the time the company refused to bargain in 1998. *Id.*

This was not a correct treatment of the company's evidence. It is true that a union may enjoy majority support

even if less than a majority of employees maintain union membership or authorize their employer to deduct union dues from their paychecks. *See, e.g.*, *Furniture Rentors of Am., Inc. v. NLRB*, 36 F.3d 1240, 1244–45 (3d Cir. 1994); *NLRB v. Koenig Iron Works, Inc.*, 681 F.2d 130, 138 (2d Cir. 1982); *NLRB v. Silver Spur Casino*, 623 F.2d 571, 580 (9th Cir. 1980). Employees may have reasons other than dissatisfaction with the union. *See Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 44 (D.C. Cir. 1980). They may wish to free ride on the payment of union dues by others, thereby obtaining the benefits of union representation while avoiding its financial burdens, or they may wish to pay their dues directly to the union. *See Lodges 1746 & 743, Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 416 F.2d 809, 812 (D.C. Cir. 1969) (citing *Convair Div. of Gen. Dynamics Corp.*, 169 N.L.R.B. 131 (1968)); *Helton v. NLRB*, 656 F.2d 883, 892 & n.46 (D.C. Cir. 1981). But the fact that the membership and dues checkoff evidence might not conclusively demonstrate lack of majority support is scarcely a reason for disregarding the evidence altogether. That is the point of this portion of the Supreme Court's opinion in *Allentown Mack*: "It must be borne in mind that the issue here is not whether [an employee's] statement clearly established a majority in opposition to the union, but whether it contributes to a reasonable uncertainty whether a majority in favor of the union existed." 522 U.S. at 371. If a high percentage of checkoffs is persuasive evidence of majority support when the employees are under no obligation to join the union, *see Peoples Gas*, 629 F.2d at 40 n.9; *Lodges 1746 & 743*, 416 F.2d at 812 & n.8, we see no rational reason why a low percentage of checkoffs—here the percentage was zero—is not persuasive for the opposite proposition, or more accurately, why the employer could not rely on such evidence to establish good-faith doubt of the union's majority support. A decline in checkoffs may indicate opposition to the union, especially if the decline is acute or accompanied by other evidence suggesting the erosion of union support, as it was here. *See, e.g.*, *Teamsters Local Union 769 v. NLRB*, 532 F.2d 1385, 1390 (D.C. Cir. 1976); *Lodges 1746 & 7430*, 416 F.2d at 812; *Thomas Indus., Inc. v. NLRB*, 687

F.2d 863, 868 (6th Cir. 1982), *overruled on other grounds*, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 364 (1998); *Convair Div. of Gen. Dynamics Corp.*, 169 N.L.R.B. 131, 134–35 (1968).

It is up to the Board to evaluate the evidence and to weigh it along with the other evidence. *See Teamsters Local Union 769*, 532 F.2d at 1390. Neither the Board nor the ALJ performed those functions in this case. The evidence showed a sharp decline in checkoffs—from all or nearly all employees to zero—and the decline corresponded with the change in the collective bargaining agreement making union membership voluntary. The natural inference is that the decline reflected a loss of union support. The applicable standard required the company to show a reasonable good-faith doubt, a "genuine, reasonable uncertainty" grounded in objective considerations. *Allentown Mack*, 522 U.S. at 367–68 & n.2. In some circumstances, and this is certainly one of them, membership and dues checkoff data "can unquestionably be probative to some degree" of that doubt. *Id.* at 380. In short, the ALJ's flat dismissal of the evidence relating to union membership (including loss of the union bug label) and dues checkoffs, based only on the Board's "traditional disregard" for such evidence, violated *Allentown Mack*'s directive that the Board's evaluation of evidence should be "a matter of logic and sound inference from all the circumstances, not an arbitrary rule of disregard to be extracted from prior Board decisions," *id.* at 379, particularly since in unfair labor practice proceedings the Board, "so far as practicable," is bound to follow the federal rules of evidence applicable in federal district courts. *See* 29 U.S.C. § 160(b); *United States v. Russo*, 104 F.3d 431, 433–34 (D.C. Cir. 1997); *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993).

The error would be beside the point if the ALJ correctly ruled that this evidence was "stale" and for that reason alone should not be considered. As to the dues checkoffs, we are baffled by the ALJ's description of the evidence as "stale." The evidence was as fresh as could be. The company knew for certain how many of its 100 employees (none) were having union dues deducted from their wages. And the company knew this while the agreement was in effect, after the con-

tract expired, and right up to the time the company refused to bargain over a new agreement. This was not old evidence; the absence of dues checkoffs was continuing and it was current. Each day without any dues authorizations constituted new evidence of lack of employee support for the union. In terms of Rule 401 of the Federal Rules of Evidence, which the Board generally must follow (29 U.S.C. § 160(b)), it was more likely with this evidence than without it that the union lacked majority support.

As to the evidence regarding lack of union membership, it is true that the company based most of its knowledge on events occurring two years before the summer of 1998. But we cannot understand how this rendered the evidence "unreliable" as the ALJ supposed. The Board has never dismissed evidence as stale based solely on its age; it has required changed circumstances or new evidence calling the reliability of the old evidence into doubt. *See Rock–Tenn Co. v. NLRB*, 69 F.3d 803, 809 (7th Cir. 1995); *Metro Health, Inc.*, 334 N.L.R.B. No. 75, 2001 WL 814951, at *2 (July 16, 2001); *Poray, Inc.*, 160 N.L.R.B. 697, 707 (1966). Nothing in the record indicated that during this two-year period there had been some resurgence of employee support for the union. The absence of any dues checkoffs indicated quite the opposite. Here again, the membership evidence may not have been conclusive. It is possible that a large number of employees changed their minds over the two-year period without this coming to the attention of the company (although there is no indication this occurred). The question, though, is whether the company had sufficient objective evidence to doubt the union's majority status. On that score the Board and the ALJ should have weighed this evidence along with the company's other evidence. The concurrence states that on remand, the Board could properly reach the same result it did here. We will not prejudge the outcome. We do not know what the Board's reasoning will be or what arguments counsel will present for and against it.

The petition for review is granted, the cross-application for enforcement is denied, and the case is remanded to the Board for reconsideration.

*So ordered.*

1

Rogers, *Circuit Judge*, concurring: I concur in granting the petition and remanding the case to the Board to evaluate the evidence and draw reasonable inferences therefrom.

The Board misinterpreted *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781 (1996), to bar reliance by an employer on pre-contract evidence, after the contract has expired, in asserting that it had a good-faith reasonable uncertainty as to the union's continuing majority status at the time it withdrew recognition. *Auciello* was decided in the context of two irrebuttable presumptions adopted by the Board to foster industrial peace and stability under the National Labor Relations Act. *Id.* at 786. Those presumptions of union majority status for one year after union certification and during the term of the parties' contract, up to three years, were based, the Court noted, " 'not so much on an absolute certainty that the union's majority status will not erode,' . . . as on the need to achieve 'stability in collective-bargaining relationships.' " *Id.* (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38 (1987)). The Court held that the Board's judgment declining to create an exception during the term of the contract for the benefit of the employer with doubts based on facts antedating the contract was "entitled to prevail." *Id.* at 787. The Court observed:

> The Board could reasonably say that giving employers some flexibility in raising their scruples would not be worth skewing bargaining relationships by such one-sided leverage, and the fact that any collective-bargaining agreement might be vulnerable to such a postformation challenge would hardly serve the Act's goal of achieving industrial peace by promoting stable collective-bargaining relationships.

*Id.* at 790.

At issue here is a rebuttable presumption of majority status upon expiration of a collective-bargaining agreement. The court states that nothing in the rationale underlying the conclusive presumption addressed in *Auciello* "bars employers from relying on pre-contract evidence" once the contract has expired. Op. at 6. The Union, as Intervenor, suggests,

however, that "[t]he same policy considerations" underlying *Auciello* apply here:

> Allowing an employer with genuine doubt about a union's majority support to bargain, reach agreement, enjoy the benefits of having reached agreement for three years, and then raise three-year old doubt . . . in the context of bargaining for a successor agreement would clearly undermine the stability of collective bargaining relationships.

Intervenor's Br. at 4. Pointing to an element of repose, the Board notes in its brief that when an employer chooses "to swallow its nascent doubt, it deprives the union of the opportunity to explain or counter the pre-contract evidence while the evidence is fresh, or to react by shoring up support." Respondent's Br. at 38. Indeed, in *Auciello* the Supreme Court rejected the employer's attempt to raise a reasonable doubt in light of the Board's judgment that "the risks associated with giving employers such 'unilatera[l] control [over] a vital part of the collective-bargaining process' . . . would undermine the stability of the collective-bargaining relationship . . . and thus outweigh any benefit that might in theory follow from vindicating a doubt that ultimately proved to be sound" was "entitled to prevail." *Auciello*, 517 U.S. at 787 (quoting *Auciello Iron Works, Inc.*, 317 N.L.R.B. 364, 370, 374 (1995)).

Although the Board's brief suggests that two Members of the Board may consider the policy concern about industrial peace under the Act, and in particular the balance of bargaining power between employer and the union, reflected in *Auciello* to be relevant in determining when the employer may rely on the requisite uncertainty, the Board's majority decision did not articulate the rationale suggested in its brief or the Intervenor's brief. Instead two Members of the Board treated the pre-contract evidence as "moot," *McDonald Partners, Inc.*, 336 N.L.R.B. No. 74, at 9, 2001 WL 1261811 (Oct. 1, 2001), viewing *Auciello* to create an evidentiary bar that extended after the contract expired. *Id.*

Because the misinterpretation of *Auciello* affects the entirety of the Board's decision, the decision must be remanded. The Board properly invoked the uncertainty test of *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359 (1998), in affirming the reasons given by the Administrative Law Judge ("ALJ") for concluding that the employer's remaining evidence of uncertainty was insufficient. After evaluating some of the evidence relied on by the employer as "unavailing" or "of little significance," *McDonald Partners*, 336 N.L.R.B. at 9, the ALJ concluded that the evidence of the employees' failure to join the union or pay dues through employer wage deductions, the employer's loss of the "bug," and a steward's statement about employee unhappiness with the union during the contract term, was "stale and unreliable," assuming the evidence to be relevant under *Allentown Mack*. *Id.* at 10. Explaining this conclusion, the ALJ referred not simply to the age of the evidence, *see* Op. at 9, but to the union merger and employee turnover in addition to the passage of two to three years. *McDonald Partners*, 336 N.L.R.B. at 10. However, because there was evidence relied on by the employer, such as other statements by the stewards and information obtained by the employer about employee unhappiness with the union, that the ALJ did not consider, based on an erroneous view of *Auciello*, a remand is required in the absence of an explanation of why pre-contract evidence either could not be considered in light of the concern about industrial peace or the balance of bargaining power, or was not probative or was stale.

The court, after recognizing that "the Board [is] to evaluate the evidence and to weigh it along with the other evidence," Op. at 8, proceeds to discuss the evidence, in particular the "sharp decline in [dues] checkoffs," *id.*, and the lack of union membership. *Id.* at 9. Indeed, the court draws several inferences of its own from that evidence, stating that "[t]he natural inference is that the decline [in dues checkoffs] reflected a loss of union support," *id.* at 8 and "[t]he evidence was as fresh as could be," and "it was current." *Id.* at 8–9. Still, the court's opinion cannot be read to restrict the Board's evaluation of the evidence on remand. Pointing to the

Board's (ALJ's) "flat dismissal of the evidence," *id.* at 8, the court instructs the Board, upon reconsideration, to evaluate the evidence as " 'a matter of logic and sound inference from all the circumstances . . . . .' " *Id.* (quoting *Allentown Mack*, 552 U.S. at 379). This is consistent with the "considerable deference" due to the Board, which Congress has established to set labor policy under the Act. *See Auciello*, 517 U.S. at 787–88 (quoting *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990)).

Without prejudging the Board's decision on remand, it is evident from the Board Chairman's separate opinion that on remand, in light of Board precedent on dues checkoff evidence[1] and stale evidence,[2] the Board could reach the same ultimate conclusion about the sufficiency of the employer's evidence to rebut the presumption of continuing majority status of the union. The Chairman rejected the interpretation of *Auciello* adopted by two Members of the Board and concluded that the pre-contract and during-contract evidence could not be relied upon by the employer because it was stale: "the evidence of employee disaffection is not close in time to the withdrawal of recognition, as required by precedent." *McDonald Partners*, 336 N.L.R.B. at 3 (Hurtgen, Chairman, dissenting in part) (citing *Curtin Matheson*, 494 U.S. at 778). Although the court professes that it is "baffled by the ALJ's

---

[1] *See, e.g., S. Bent & Bros.*, 336 N.L.R.B. No. 72, 2001 WL 1261817, at *2 & *18 (Oct. 1, 2001); *Metro Health, Inc.*, 334 N.L.R.B. No. 75, 2001 WL 814951, at *2 (July 16, 2001); *Henry Bierce Co.*, 328 N.L.R.B. 646, 648 (1999); *Pioneer Press*, 297 N.L.R.B. 972, 992 (1990); *Imperial House Condos., Inc.*, 279 N.L.R.B. 1225, 1225, 1237 (1986); *ACL Corp.*, 278 N.L.R.B. 474, 480 (1986); *Louis Pappas' Homosassa Springs Rest., Inc.*, 275 N.L.R.B. 1519, 1527 (1985); *Bartenders, Hotel, Motel and Rest. Employers Bargaining Ass'n*, 213 N.L.R.B. 651, 652, 659 & n.6 (1974).

[2] *See, e.g., Curtin Matheson*, 494 U.S. at 778; *Nova Plumbing, Inc.*, 336 N.L.R.B. No. 61, 2001 WL 1216968, at *7 (Sept. 30, 2001); *Metro Health*, 334 N.L.R.B. No. 75, 2001 WL 814951, at *3; *Manna Pro Partners, L.P.*, 304 N.L.R.B. 782, 782 (1991).

description of the [dues checkoff] evidence as 'stale,' " Op. at 8, the record evidence showed that the absence of dues checkoffs was old news; the employer had declined to acknowledge checkoffs prior to the 1995 contract and the authorizations were optional under the 1995–98 contract. In the meantime, as the ALJ noted, several years had passed, the Union had merged, and there had been employee turnover at the company. So viewed, the lack of union dues checkoffs was not "fresh" or "current" evidence "close in time" to the employer's withdrawal of recognition.

The Board's discussion in other cases of free riders and other explanations for the lack of voluntary dues checkoffs, as under the 1995–98 contract, supports the Chairman's analysis. *See supra* n.1. Whether a majority of the Board adopts that analysis on remand remains to be seen. Moreover, other Board policies may be implicated, Intervenor suggests, *see* Intervenor Br. at 5, by allowing employer reliance on dues checkoff evidence such that doing so would give the employer greater rights to oust the union than are possessed by the employees, for "[g]enerally, the Board does not rely on employees' signatures on a petition seeking representation or seeking to oust a representative that are more than one year old." *Id.* (citing *Audubon Reg'l Med. Ctr.*, 331 N.L.R.B. No. 42, 2000 WL 856016, at *79 (June 22, 2000); *Aircap Mfrs.*, 287 N.L.R.B. 996, 1033 (1988)). On remand the Board can evaluate the employer's evidence, absent the *Auciello* error, in light of such Board policies as may be implicated.