United States Court of Appeals
Fifth Circuit

**F I L E D**

June 21, 2004

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

———————

No. 03-60498

———————

TRI-STATE HEALTH SERVICE, INC.,
DOING BUSINESS AS EDEN GARDENS NURSING HOME

Petitioner-Cross-Respondent,

VERSUS

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner,

———————

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———————

Before GARWOOD, HIGGINBOTHAM, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Tri-State Health Service, Inc. ("Tri-State"), seeks review of a decision of the National Labor Relations Board ("NLRB" or "Board") finding that Tri-State lacked a good faith doubt in the continued majority status of a union with which it refused to bargain. The Board pursues a cross-petition for enforcement. Agreeing with Tri-State that the decision violates *Allentown Mack Sales & Serv. Corp. v. NLRB*, 522 U.S. 359 (1998), we grant the petition for review and deny the cross-petition for enforcement.

I.

We consider whether Tri-State committed an unfair labor practice in violation of § 8(a)-(1) and (5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (5), when it refused to bargain with the incumbent

Service Employees International Union.[1] Tri-State is the owner and currently the operator, of Eden Gardens Nursing Home. Though Tri-State has owned the facility since it opened in 1975, it has periodically leased it to other management firms. It was during one such period in 1996, with the nursing home under the management of Woodard Health Services, Inc. ("Woodard"), that the union was certified as the bargaining representative for the home's unskilled labor.[2] By the time a collective bargaining agreement ("CBA") was successfully negotiated in October 1997, Woodard had subleased operations to Camelot Healthcare, L.L.C. ("Camelot").[3]

Camelot's tenure in charge of the nursing home was rocky, marked by an inability to pay contractual wages, the union's successful pursuit of an unfair labor practice charge, and, eventually, an inability to pay rent. During this same period, some union members began to grow dissatisfied with the union's representation.[4]

Circumstantial evidence of that development came in several different forms. For example, between early 1998 and the fall of 1999, the number of employees authorizing automatic deductions of their union dues (known as dues checkoffs) fell from eleven to zero. None of the nursing home's employees served as a union steward, and the sole example of union activity consisted of the posting of a flyer announcing the grievance being pursued against Camelot.

Anecdotal evidence paints a similar picture. Wanda Smith, a supervisor at the nursing home, overheard three nurse's aides complaining that their union dues had not earned them meaningful benefits.[5] An assistant administrator, Suzanne Price, similarly claims to have been approached by four employees and

[1] Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Generally, any such violation is also taken to be a violation of § 8(a)(1), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1).

[2] The bargaining unit was comprised of nurse's aides, and maintenance, laundry, housekeeping, and food service workers. At all relevant times, there were between thirty and forty workers in the unit.

[3] The CBA was effective for only two years but was renewable through an "evergreen clause" that required the parties to submit written notice of their desire to terminate or amend the CBA. The evidence suggests that the agreement was renewed in this fashion and therefore continued in force through the fall of 2000.

[4] To the extent there is any causal connection between Camelot's actions and the decline in union support, the Board expressly disavows the notion that Tri-State, as a successor entity, is thereby disqualified from asserting it possesses a good faith doubt concerning the union's continued majority status. Cf. Raven Serv. Corp. v. NLRB, 315 F.3d 499, 506 (5th Cir. 2003) (requiring employer to show that the doubt arose "in a context free of unfair labor practices that could have reasonably tended to contribute to employee dissatisfaction with the union"). We therefore express no opinion on that question.

[5] The probative value of that assertion is limited, however, because Smith's testimony was not introduced for the truth of those complaints, but only to establish the state of mind of Tri-State's administrators when they subsequently refused to bargain with the union. Cf. FED. R. EVID. 801(c).

told that they wished to cancel their dues checkoffs because they no longer wanted to be represented by the union.[6]

The present dispute arises from actions Tri-State failed to take on its resumption of control of the nursing home in March 2000, when Woodard's lease expired. Tri-State chose not to inform the union of the change in management or to respond to the union's invitations to negotiate a new CBA.

Tri-State later justified its refusal to bargain on the ground that it possessed a genuine doubt as to whether the union continued to command the support of a majority of the bargaining unit. The union responded by filing a grievance with the Board. Following a hearing before an administrative law judge ("ALJ"), it was determined that Tri-State was a successor to Camelot within the meaning of *NLRB v. Burns Int'l Sec. Serv., Inc.*, 406 U.S. 272 (1972), and that Tri-State lacked sufficient justification for refusing to bargain.

Accordingly, Tri-State was found to be in violation of NLRA § 8(a)(1) and (5). In his ruling, the ALJ assigned probative weight only to Smith's claim that she had heard three employees complain about the union. The ALJ dismissed, for want of credibility, Price's similar claim and found irrelevant the evidence of declining dues checkoffs and low union activity. The ALJ also rejected the notion that Tri-State could rely on the union's margin of victory during the certification elections as an indicator of the union's low level of support. The Board affirmed, taking only minor exceptions to the ALJ's reasoning.

---

[6] That evidence, too, was admitted only for purposes of establishing a state of mind, and the Board ultimately discredited it.

## II.
### A.
We must uphold the Board's finding that Tri-State violated its duty to bargain if that decision is supported by substantial evidence on the record as a whole. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 42 (1987); 29 U.S.C. § 160(e). If a reasonable jury could have reached the Board's conclusion, it must be upheld. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-67 (1998). Nevertheless, the Board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Id*. at 378.

### B.
An employer is required to bargain with the representative of its employees, and its failure to do so constitutes an unfair labor practice. *See* NLRA § 8(a)(5), 29 U.S.C. § 158(a)(5). That requirement, however, attaches only for so long as the union retains the support of a majority of employees in the bargaining unit.

To that end, there is a conclusive presumption that the union retains majority support for one year after its election as the representative of a bargaining unit. *Auciello Iron Works v. NLRB*, 517 U.S. 781, 786 (1996). The union also is entitled to a conclusive presumption of majority status during the pendency of a collective-bargaining agreement, up to a maximum of three years. *Id*.

Thereafter, the union is entitled to only a rebuttable presumption of majority status. *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 778 (1990). An employer may overcome this latter presumption and refuse to bargain if it shows either that the union did not enjoy majority support within the relevant bargaining unit, or that the employer had a

"'good-faith' doubt, founded on a sufficient objective basis, of the union's majority support." *Id*; *see also Raven Serv. Corp.*, 315 F.3d at 506.[7]

To claim validly that it possesses a good faith doubt regarding the union's majority status, an employer need not prove that it has a sincere belief that the union in fact lacks majority support. *Allentown Mack*, 522 U.S. at 367. Rather, it must only substantiate uncertainty on that score. *Id.* It is therefore unreasonable for the Board to disregard evidence that would tend to support the inference that workers do not support the union, even if the same evidence is capable of supporting other, more neutral inferences. *Id.* at 369.[8]

## III.

Tri-State argues that its good faith doubt about the union's majority status is supported by five pieces of evidence. Of these, the ALJ and the Board credited only one and found it insufficient, standing alone, to excuse Tri-State's refusal to bargain with the union.

The Board erred in refusing to credit two further items of evidence. Once these additional data points are factored into the analysis, it is apparent that the Board's finding of an unfair labor practice is not supported by substantial evidence.

### A.

The Board accepted the ALJ's determination that Smith's testimony supports Tri-State's claimed good faith doubt, and we agree. We also concur with the Board that this evidence is insufficient, by itself, to create a genuine good faith doubt about the union's majority status. Although Smith's testimony supports an inference that three employees shifted their support away from the union, that inference is countered by the fact that the union had been certified by a much larger margin. As a result, the substance of Smith's testimony would not cause a reasonable employer to question whether the union had lost its majority support.

### B.

The Board rejected Tri-State's contention that it could look to the decline in union dues checkoffs as a barometer of the union's support. The Board explained:

> Employee cancellations of dues-checkoff authorizations may be attributable to many factors other than opposition to a union . . . . [E]mployees may prefer to pay their dues only at convenient times or in person, or may even be 'free riders' who desire and accept union representation without joining the union and paying dues.

---

[7] Although the record suggests the CBA was in force and in only its third year when Tri-State resumed control of the facility in March 2000, neither party argues that the union is thereby entitled to a conclusive presumption of its majority status. We therefore assume that the presumption relevant to this case is the rebuttable one.

[8] In the wake of *Allentown Mack*, the Board has adopted a more restrictive interpretation of the NLRA—one that it abjectly denied using in its arguments to the *Allentown Mack* Court. *See Levitz Furniture Co.*, 333 NLRB No. 105, 2001 WL 314139 (2001). Under the Board's current interpretation, an employer can justify a refusal to bargain with an incumbent union only by showing that the union has in fact lost the support of a majority of the bargaining unit. *Id.* at *11-*12. The Board concedes, however, that this more restrictive standard does not apply to the current case, which was pending when the Board decided *Levitz*.

(Internal quotations omitted.)

This is precisely the sort of reasoning rejected in *Allentown Mack,* 522 U.S. at 369. There, the Court discussed the significance of an employee's statement that could have been interpreted as reflecting only a desire for better union representation, but also could have been interpreted as reflecting a desire to abandon the union. *Id.* The Board purported to resolve the ambiguity, concluding (as it did here with the dues checkoffs) that the evidence was most reasonably interpreted in a manner that did not cast doubt on the union's majority status. *Id.* Accordingly, the Board determined that the evidence was not probative of the employer's uncertainty.

The Court reversed, reasoning that the existence of two possible interpretations of the evidence meant only that it could not establish the fact of a decline in majority status. Nevertheless, "[t]he statement would assuredly engender an *uncertainty* whether the speaker supported the union, and so could not be entirely ignored." *Id.* Thus, in evaluating an employer's claim of uncertainty, the Board is not free to choose between two reasonable interpretations of the evidence and prescribe the one that the employer should have adopted. So long as the employer's interpretation is reasonable, and the evidence so interpreted tends to engender uncertainty as to whether the union still commands majority support, the evidence is probative and must be considered.

The same principle governs our consideration of the decline in dues checkoffs. The Board is, of course, correct to note that a decline in checkoffs may be attributable to some innocent explanation, and an employer reasonably could conclude that such evidence does not engender any uncertainty about the level of support the union enjoys. Nevertheless, it is equally as reasonable for an employer to witness a decline in checkoffs and infer that its current work force is less supportive of the union than it was just a few years before, when eleven employees manifested support for the union by authorizing direct withdrawal of dues from their paychecks.

We agree with the only court of appeals to have considered the issue in the wake of *Allentown Mack*, that "[t]he natural inference is that the decline reflected a loss of union support," and that "[i]n some circumstances, and this is certainly one of them, membership and dues checkoff data 'can unquestionably be probative to some degree' of [the employer's] doubt." *McDonald Partners, Inc. v. NLRB*, 331 F.3d 1002, 1007 (D.C. Cir. 2003) (quoting *Allentown Mack*, 522 U.S. at 380).[9] To that

_____

[9] In support of its claim that this evidence is irrelevant, the Board relies on a number of decisions that pre-date *Allentown Mack* and stand for the proposition that a decline in dues check-offs lacks probative value because it is susceptible to more than one interpretation. *See, e.g., People's Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 40 n.9 (D.C. Cir. 1980) (averring that although a high level of dues checkoffs indicates support for the union, the converse is not true); *NLRB v. Wallkill Valley Gen. Hosp.*, 866 F.2d 632, 637 (3d Cir. 1989) (accepting Board's conclusion that low number of dues checkoffs is not probative of a decline in union support). After *Allentown Mack*, such reasoning is faulty, for it overstates the Board's objective in assessing doubt. The existence of two possible interpretations is the very essence of uncertainty, not a rebuttal of it.

Further, in *Allentown Mack*, 522 U.S. at 379, the Court stressed that the issue of assessing good
(continued...)

5

end, it is inescapable that one of first things an employee would do, on resolving to leave the union, is ask the employer to stop taking union dues out of his paycheck. Although this might not be the only reasonSSor even the most common reasonSSan employee asks to cease participation in the checkoff program, it is nonetheless a realistic possibility that can engender some degree of uncertainty in the mind of the employer. The board erred in disregarding this evidence altogether.

In considering the weight accorded this evidence, however, we are mindful that some of the decline in dues checkoffs is the product of employee terminations. Indeed, according to an affidavit submitted by one of Tri-State's supervisors, the final two employees enrolled in the program had their checkoff authorizations canceled unilaterally by Camelot in 1999.

At best, therefore, the evidence would lead a reasonable employer only to believe that union supporters who lost their job were replaced by employees who did not manifest the same degree of outward support for the

---

[9](...continued)
faith doubt "is a matter of logic and sound inference from all the circumstances, not an arbitrary rule of disregard to be extracted from prior board decisions." When reason counsels that a category of evidence has a logical connection to the matter in dispute, it is not enough for the Board merely to string-cite a list of cases in which similar evidence was found to have no bearing on a dispute involving different parties and a different set of operative facts. Rather, the Board is justified in dismissing evidence outright only if it can show that it isSSas a matter of logic and reasonSSunhelpful to the position in support of which it is proffered. The Board has not done that here.

union.[10] In other words, the evidence tends to create some uncertainty, but on the facts of this case it is nevertheless an insufficient basis for Tri-State's refusal to negotiate.

## C.

The ALJ and the Board discredited the testimony of Price, who claimed to have had conversations with four employees who had expressed their dissatisfaction with the union and requested cancellation of their dues checkoffs. The ALJ apparently discredited Price solely on the ground that her memory of those conversations was insufficiently detailed to convince him that they took place. The Board deferred to the ALJ's credibility assessment and asks us to do the same.

Ordinarily, we defer to an ALJ's finding that turns on an evaluation of a witness's credibility. *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 635 (5th Cir. 2003). Nevertheless, no deference is owed the ALJ or the Board in their interpretations of the law, *J. Vallery Elec., Inc. v. NLRB,* 337 F.3d 446, 450 (5th Cir. 2003), and the error here is a legal one.

In dismissing the probative impact of Price's testimony, the ALJ focused only on whether it was convincing evidence that the conversations occurred sometime in 1998. That is not the relevant inquiry. To the contrary, since it was neither Price nor the ALJ who formed the conclusion that Tri-State need not bargain with the union, it is ultimately irrelevant whether the ALJ believed Price was

---

[10] The employer is not entitled automatically to assume that all replacement workers oppose the union, *Curtin Matheson.*, 494 U.S. at 778-79, but it may rely on objective evidence tending to show that this is the case, *Allentown Mack*, 522 U.S. at 369-70.

telling the truth when she claimed to have heard four employees express a desire to abandon the union. All that matters is whether the ALJ had reason to believe that Tollie Bordeaux, the owner and President of Tri-State ultimately responsible for the refusal to bargain, either did not believe, or should not have believed Price's claims when she related them to him.

It is Bordeaux's mind set, and the level of doubt and uncertainty lingering therein, that is of ultimate consequence. Indeed, the ALJ admitted Price's testimony over a hearsay objection only because it was offered to prove not the truth of her assertions, but Bordeaux's state of mind when he decided not to bargain. Accordingly, the ALJ based his credibility determination on an irrelevant ground, and we do not defer to it.

At oral argument, the Board conceded that the evidence shows Price communicated the substance of her testimony to Bordeaux before he charted a course of refusing to negotiate. Rather than contest that fact, the Board took the untenable position that even if Price told Bordeaux that these conversations occurred, and he acted in reliance on that representation, the ALJ was free to disregard the evidence if Price's assertions later proved to be untrue. That is to say, even if Price genuinely convinced Bordeaux that employees were dissatisfied with the union, and he had no reason to doubt her veracity, he could rely on that evidence only at his peril, because a subsequent showing that Price lacked credibility worked to undermine his use of the evidence, too.

That position is unsound as both a logical and a doctrinal matter. If adopted, the position advanced by the Board would be less one of good faith doubt than of strict liability. Any time an employer acted on an uncertainty that was later resolved against it, it would be subject to a finding of an unfair labor practice merely because it lacked the prescience to anticipate subsequent developments.

It would be a different matter altogether if the evidence relied on was so lacking in indicia of reliability that any reasonable employer would doubt its veracity. We know that is not the case here, however, because the type of evidence Tri-State relied on is nearly identical to that the Court sanctioned in *Allentown Mack*. There, the Court required the Board to credit, as supporting a good faith doubt, statements by individual employees claiming to speak for a larger group of employees, even where the larger group's views were not substantiated in any other form:

> Unsubstantiated assertions that other employees do not support the union certainly do not establish *the fact of that disfavor* with the degree of reliability ordinarily demanded in legal proceedings. But under the Board's enunciated test . . . it is not the fact of disfavor that is at issue . . . but rather the existence of a reasonable uncertainty on the part of the employer regarding that fact. On that issue, absent some reason for the employer to know that [the declarant] had no basis for his information, or that [the declarant] was lying, reason demands that the statement be given considerable weight.

*Allentown Mack*, 522 U.S. at 369-70. There is nothing in the record even tending to show that Bordeaux should have believed Price was lying to him. The Board therefore erred in failing to consider this evidence.

7

Once Price's testimony is factored into the analysis, Tri-State's showing of a good faith doubt is more than sufficient to justify its refusal to bargain with the union. This is because Price's testimony amplifies and reinforces the inference that the decline in dues checkoffs corresponds with a decline in union support. Because Bordeaux was entitled to draw a connection between the two events, and to combine those two factors with Smith's claim that an additional three employees expressed their dissatisfaction with the union, he had good cause to be uncertain whether the union continued to have majority support.[11]

We therefore GRANT the petition for review, VACATE the Board's opinion, DISMISS the charges against Tri-State, and DENY the cross-petition for enforcement.

---

[11] The Board also erred in ignoring altogether evidence of the union's margin of victory in the most recent election. This court's decision in *NLRB v. A.W. Thompson, Inc.*, 651 F.2d 1141, 1145 (5th Cir. Unit A Sept. 1981), does not stand for the proposition that election results are categorically irrelevant to an assessment of the employer's doubt, but only that such evidence has no tendency to show a decline in union support following the election.

Even so, election results can give the employer an indication of the extent to which union support needs to erode before there is any uncertainty as to whether it continues to possess majority support. Surely the Board would not dispute that an employer needs more substantial evidence of a decline in support before it refuses to bargain with a union that had recently been certified by a margin of 99 to 1, than it does if the union only won by a measure of 51 to 49. Substantial evidence does support, however, the Board's determination that there was not a notable absence of union activity at the plant.